COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Clements and Agee[*]
Argued at Richmond, Virginia


JOHN LONDONO

                                              OPINION BY
v.   Record No. 2628-01-2      JUDGE JEAN HARRISON CLEMENTS
                                             APRIL 29, 2003
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF HENRICO COUNTY
                   George F. Tidey, Judge

          Stephen R. Cutright (David L. Carlson, on
          brief), for appellant.

          John H. McLees, Senior Assistant Attorney
          General (Jerry W. Kilgore, Attorney General,
          on brief), for appellee.


     John Londono was convicted of transporting into the

Commonwealth more than one ounce of heroin with intent to

distribute, in violation of Code § 18.2-248.01, and of conspiring

to transport into the Commonwealth more than one ounce of heroin

with intent to distribute, in violation of Code § 18.2-248.01.

On appeal, Londono contends the trial court erred (1) in denying

his motion to dismiss under Code § 19.2-294 on the grounds he had

already been prosecuted for the same conduct and acts in federal

court, (2) in denying his motion to suppress on the grounds he

was illegally seized in violation of his Fourth Amendment rights,

and (3) in denying his motion to exclude evidence previously

_____

     * Justice Agee participated in the hearing and decision of
this case prior to his investiture as a Justice of the Supreme
Court of Virginia.

suppressed in federal court under the doctrines of <u>res</u> <u>judicata</u> and collateral estoppel.  Finding no error, we affirm the convictions.

I.  BACKGROUND

In accordance with familiar principles of appellate review, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party that prevailed below.  <u>See</u> <u>Dowden v.</u> <u>Commonwealth</u>, 260 Va. 459, 461, 536 S.E.2d 437, 438 (2000).

So viewed, the evidence established that, on October 7, 2000, at approximately 10:00 a.m., Detective Anthony Patterson of the Petersburg Police Department and Detective Jack O'Connor of the Richmond Police Department boarded Amtrak train number 92 at the Amtrak Station located on Staples Mill Road in Henrico County.  Patterson and O'Connor were both narcotics detectives assigned at the time to the Richmond Metropolitan Interdiction Unit (RMIU or Unit), a cooperative task force made up of officers assigned to it from the police departments of the Cities of Richmond and Petersburg; the Counties of Henrico, Chesterfield, and Hanover; the Virginia State Police; and the Richmond International Airport and an agent with the Drug Enforcement Agency (DEA).

The RMIU is a hybrid entity.  The salary of each officer or agent assigned to the Unit is paid by his or her respective police department or agency, and the participating jurisdictions contribute to underwrite the expenses of the Unit.  The Unit was created and is operated pursuant to a written agreement entered into by the chief law enforcement officials of the participating

jurisdictions and the DEA.  The RMIU's mission is to interdict, arrest, and prosecute "narcotic couriers using public transportation, specifically, rail, aircraft, bus and parcel packages" in the Richmond metropolitan area.  Each officer in the Unit is sworn in as a special officer with the Virginia State Police and, thus, empowered with the authority of the State Police to enforce the narcotics laws of the Commonwealth.

Based upon information received from the DEA regarding a "suspicious ticket" purchased by "two subjects riding from Miami to New York in a sleeper car," Detectives Patterson and O'Connor went to Sleeper Car 9211, Room 8.  Patterson's role was to speak to the occupants of the room, and O'Connor's role was to back up Patterson.  Both detectives were in plain clothes and did not have their weapons displayed.

Detective O'Connor rang the bell and stepped back into the doorway of the vacant sleeper-car room across the hall to allow passengers to pass while the confrontation was occurring.  When Londono opened the sliding door to the room, Detective Patterson displayed his badge, identified himself as a police officer, and asked if he could speak with Londono.  Londono replied, "Yes," in English.  Another man, later identified as Orlando Betancourt, was sitting on the bed inside the room.

Following his standard procedure, Patterson advised the men that he was "trying to stem the flow of narcotics coming to the Commonwealth and through the Commonwealth."  He did not accuse the men of having narcotics in the room or otherwise make any accusatory statements.  Patterson then asked Londono and Betancourt if they had "any weapons, large amounts of money, or

drugs" on their persons or in the room.  Londono answered that he did not.  Patterson turned to Betancourt to obtain his response to the question but Londono told him that Betancourt did not speak English.

Patterson then asked to see Londono's tickets.  Londono retrieved the tickets from inside the room, stepped back into the doorway, and showed the tickets to Patterson.  Patterson did not take the tickets but observed that Londono was breathing heavily, had a look of panic on his face, and was visibly shaking as he displayed the tickets to the detective.  Patterson, who was also standing in the doorway in order to allow passengers to pass behind him through the narrow hallway, asked again whether Londono had any guns, drugs, or large amounts of money, and Londono again answered, "No."

Detective Patterson then asked Londono if he could search the sleeper-car room.  Londono said, "Yes, go ahead," and motioned Patterson into the room.  Patterson asked Londono and Betancourt to step out into the hallway while he conducted the search, and they left the room.  Neither exit of the train car was blocked while Londono and Betancourt were in the hall.

Detective O'Connor testified that Detective Patterson did not raise his voice during the encounter and was his usual "soft-spoken" and "low key" self.  Patterson testified that, throughout the encounter with Londono, he and Londono spoke entirely in English and that at no time did Londono indicate that he did not understand what the detective was saying and doing. Patterson further testified that he "[d]id not have any concerns about [Londono's] ability to understand [him]."

Searching the sleeper-car room, Patterson found a black tote bag in an upper compartment of the room.  Patterson asked Londono whose bag it was, and Londono said, "It's mine."  Patterson opened the bag and found a "large amount" of what he suspected were illegal drugs inside.  The suspected drugs, which were later determined by laboratory analysis to be nearly two thousand grams of heroin with eighty-eight percent purity, were packaged in the "fingertips of latex gloves cut out, wrapped in black tape."

At that point, Detective Patterson told Detective O'Connor what he had found and told him to place Londono under arrest.  O'Connor handcuffed Londono, and Patterson handcuffed Betancourt.  O'Connor advised both men of their <u>Miranda</u> rights in English while Patterson continued searching the sleeper-car room.  Londono indicated, in English, that he understood his rights and informed O'Connor that Betancourt did not speak English.

After Detective Patterson had gathered up all the belongings from the sleeper-car room, Detective O'Connor led Londono and Betancourt out of the train onto the platform and into the terminal.  O'Connor and Londono conversed in English as they walked.  During that conversation, Londono asked O'Connor to let him go, assuring him that he would "never do it again."  He also told O'Connor that he was interested in cooperating with the detectives.

Detective Patterson then drove Betancourt to the interdiction task force office on Westwood Avenue in Richmond, and Detective O'Connor followed with Londono in his car.  During the drive, O'Connor and Londono resumed their conversation, which was again held in English.  Londono told O'Connor that a man

named "Alonzo" had given the drugs to Betancourt and him in Florida and told them to take them by train to New York City, where he would meet them to pick up the drugs, reimburse them for their train tickets, and pay them each "around a thousand dollars." Londono also told O'Connor that he would be interested in helping himself and the police by delivering the drugs to Alonzo.

Upon reaching the interdiction task force office, Londono continued to talk with Detective O'Connor, telling him about where he lived and worked. When asked why he had decided to transport the drugs, Londono said, "I just got greedy." Saying it was "the first time" and he would "never do it again," Londono again asked O'Connor to let him go. Eventually, Londono stated that he was "getting afraid" and was "going to call a lawyer," at which point the interrogation ceased.

Detective O'Connor testified that Londono gave no indication that he had any difficulty understanding the detective during any of their conversations. According to O'Connor, he and Londono engaged in "back and forth" discussion and Londono spoke in "complete sentences in English." O'Connor testified that, based on Londono's ability to converse in English and his appropriate responses to the questions put to him in English, the detective had no doubt that Londono "spoke English" and that he "understood what was going on" and "what [the detectives] were asking" during the encounter on the train and during the ensuing conversations.

Because the weight of the suspected drugs recovered from the sleeper-car room exceeded the amount necessary for federal mandatory minimum sentencing provisions to apply, Detectives

Patterson and O'Connor contacted Brian Bonifant, the DEA agent assigned to the RMIU, who indicated that he wanted to present the case to federal prosecutors.[1] Accordingly, Londono was taken to the DEA offices and processed there. During that processing, Bonifant engaged in conversation with Londono, in English, for approximately five minutes. According to Bonifant, he had no difficulty communicating in English with Londono and Londono gave no indication that he had any trouble understanding the DEA agent.

Later, while being held on federal charges in the Northern Neck Correctional Facility, Londono had "counseling sessions" with Reverend Murphy Brooks, a pastor at that facility. Reverend Brooks, who does not speak Spanish, testified that the sessions were conducted in English and that Londono spoke with him in complete sentences in English. At no point, according to Reverend Brooks, did Londono ever indicate that he did not

---

[1] Although the RMIU's written agreement is silent on the subject, its officers routinely follow the policy that, if an investigation leads to discovery of a controlled substance sufficient in weight to qualify for federal minimum sentencing or if the investigation indicates that the arrest and prosecution of the suspect may lead to the apprehension of an interstate drug operation, the suspect, when arrested, will be charged with federal violations by the DEA agent assigned to the Unit. Otherwise, the charges will generally be based on violations of the Code of Virginia. The ultimate determination of whether the suspect will be prosecuted on federal charges is made by the United States Attorney's Office, and the authority to prosecute on state charges rests with the Commonwealth's Attorney of the jurisdiction in which the offense occurs.

understand the pastor and, when asked whether he understood what the pastor was saying, Londono said that he did.

On October 18, 2000, Londono was indicted in the United States District Court for the Eastern District of Virginia, Richmond Division.  He was charged with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, and possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(b)(1)(A)(i).  On January 10, 2001, at the conclusion of a suppression hearing, the federal district court granted Londono's motion to suppress the heroin found in his possession and his confession.  The United States Attorney's Office subsequently dropped all charges against Londono.

On January 11, 2001, various officers of the RMIU, including Detective O'Connor, were at their office discussing the outcome of the federal suppression hearing with their supervisor, Detective Robert Cerillo.  Russell Stone, the Special Counsel for the Richmond Metropolitan Multi-Jurisdictional Grand Jury,[2] was in his office only a few feet away and overheard the discussion.  Leaving his office, he joined the discussion.  The officers told Stone that the federal court had suppressed the evidence because it had found that Londono's consent was not valid.  The officers expressed their surprise that Londono had been able to convince the judge that he could not understand English.

_____

[2] Although the Richmond Metropolitan Multi-Jurisdictional Grand Jury has offices on Westwood Avenue in Richmond, in the same building as the RMIU, it is a separate entity funded through grants by the Commonwealth.  It investigates narcotics offenses in the City of Richmond and Henrico, Hanover, and Chesterfield Counties but does not normally consider the cases originated by the RMIU.

Stone, who, "because of the weight of the substance involved," was "immediately interested" in prosecuting Londono on state charges if possible, told the officers he would look into the matter.  Concerned about the issues of double jeopardy, collateral estoppel, and the potential applicability of Code § 19.2-294, Stone researched the matter on his own.

Based on that research, Stone devised a tentative plan to prosecute Londono under Code § 18.2-248.01 for transporting heroin into the Commonwealth with intent to distribute and for conspiring to do so.  Stone believed a state prosecution on such charges would not be barred under Code § 19.2-294 because the charges required the separate act of transportation.  Stone called the Virginia Attorney General's Office to discuss his plan to prosecute Londono in Henrico County.  None of the attorneys with whom he spoke told him his plan was legally unsound.

Consistent with his usual practice of securing approval from the Commonwealth's Attorney of the jurisdiction in which he sought to prosecute a case, Stone called the Commonwealth's Attorney for Henrico County, Wade Kizer, and discussed the matter with him.  Kizer approved of Stone's planned prosecution. Kizer's Chief Deputy, Duncan Reid, testified that Kizer had the ultimate authority to decide whether or not to prosecute state charges arising from offenses occurring in Henrico County.

On January 16, 2001, Stone, who did not speak with any of the federal prosecutors involved in Londono's federal prosecution until "weeks after the [state] charges were placed," told Detective Cerillo to obtain arrest warrants in Henrico County

charging Londono with transporting heroin into Virginia with intent to distribute, in violation of Code § 18.2-248.01, and with conspiring to do so.  Cerillo relayed these instructions to Detective O'Connor, who went to the magistrate to obtain the warrants.  O'Connor obtained warrants charging Londono with transporting more than one ounce of heroin into the Commonwealth, in violation of Code § 18.2-248.01, and a second, incorrectly written warrant for conspiracy to possess with intent to distribute heroin that was later "nolle prossed."

The regular grand jury in Henrico County issued indictments against Londono on March 12, 2001.  However, those indictments were subsequently "nolle prossed" because their wording was improper.

On March 29, 2001, the Richmond Metropolitan Multi-Jurisdictional Grand Jury issued indictments charging Londono with transporting into the Commonwealth more than one ounce of heroin with intent to distribute, in violation of Code § 18.2-248.01, and conspiring to transport into the Commonwealth more than one ounce of heroin with intent to distribute.  Those indictments constitute the charges on which Londono was ultimately tried and convicted.

On April 4, 2001, the Circuit Court of Henrico County (trial court) conducted a hearing on Londono's motion to dismiss the indictments based on his special plea of former jeopardy under Code § 19.2-294.  The trial court denied the motion.

On May 1, 2001, the trial court held a hearing on Londono's motion to exclude evidence previously suppressed in the United

States District Court on the basis of res judicata and collateral estoppel. The trial court denied the motion.

On May 8, 2001, the trial court held a hearing on Londono's motion to suppress the evidence based on Fourth Amendment grounds. Finding that no seizure had occurred and that Londono's consent to search his sleeper-car room was valid, the trial court denied the motion.

On June 5, 2001, Londono filed a motion to reconsider the issue of res judicata and collateral estoppel. Following Londono's introduction into the record of the transcripts of the related federal proceedings, the trial court took the matter under advisement. Following a bench trial held that same day, the trial court convicted Londono of both counts charged in the indictments. The trial court ultimately denied the motion to reconsider, sentenced Londono to ten years' incarceration with five years suspended on each count, and assessed a $50,000 fine.

This appeal followed.

## II. MOTION TO DISMISS

Londono contends on appeal that the trial court erred in denying his motion to dismiss based on his special plea of former jeopardy under Code § 19.2-294.[3] Code § 19.2-294, Londono argues, bars his prosecution by the Commonwealth on the charged

---

[3] In asserting this assignment of error, Londono relies exclusively upon the preclusion of Code § 19.2-294 to bar the present prosecution. He presents no claim invoking the constitutional defense of double jeopardy.

offenses because he had already been prosecuted for the same conduct and acts in federal court.

The Commonwealth contends its prosecution for transporting and conspiring to transport heroin into the Commonwealth is not barred under Code § 19.2-294 because the statute Londono was charged with having violated in the state proceeding criminalizes acts that are separate and distinct from those acts Londono was charged with having violated in the federal proceeding. We agree with the Commonwealth.

Under the version of Code § 19.2-294 applicable to this case, "if the same act be a violation of both a state and a federal statute a prosecution under the federal statute shall be a bar to a prosecution under the state statute." The prosecution under the federal statute is deemed to have commenced "with the return of an indictment by a grand jury or the filing of an information by a United States Attorney." Code § 19.2-294.

> Although the language of Code § 19.2-294 does not state that it provides a defense of former jeopardy, "it amounts to such a defense in purpose and desired effect." Epps v. Commonwealth, 216 Va. 150, 155, 216 S.E.2d 64, 68 (1975); Sigmon v. Commonwealth, 200 Va. 258, 263, 105 S.E.2d 171, 175-76 (1958). Like the Fifth Amendment bar of former jeopardy, Code § 19.2-294 prevents the Commonwealth from "subjecting an accused to the hazards of vexatious, multiple prosecutions." Hall v. Commonwealth, 14 Va. App. 892, 899, 421 S.E.2d 455, 460 (1992) (en banc).

Phillips v. Commonwealth, 257 Va. 548, 551-52, 514 S.E.2d 340, 342 (1999).

However, unlike the Fifth Amendment prohibition against double jeopardy, which is dependent on "the identity of the

offense, and not the act," Epps, 216 Va. at 153-54, 216 S.E.2d at 67, the prohibition of Code § 19.2-294 "is dependent upon 'the identity of the act,'" rather than the identity of the offense, Lash v. County of Henrico, 14 Va. App. 926, 930, 421 S.E.2d 851, 853 (1992) (en banc) (quoting Jones v. Commonwealth, 218 Va. 757, 760, 240 S.E.2d 658, 661 (1978)).  In other words, Code § 19.2-294 "speaks to 'acts' of the accused, not elements of the offense."  Wade v. Commonwealth, 9 Va. App. 359, 365, 388 S.E.2d 277, 280 (1990).  Thus, because "[t]he prohibition only 'forbids multiple prosecution of offenses springing from the same criminal act[,]'" if the federal and state "statutory violations involve different acts, the prohibition is not applicable."  Lash, 14 Va. App. at 930, 421 S.E.2d at 853 (quoting Jones, 218 Va. at 761, 240 S.E.2d at 661 (emphasis in original)).

"The test of whether there are separate acts sustaining several offenses 'is whether the same evidence is required to sustain them.'"  Treu v. Commonwealth, 12 Va. App. 996, 997, 406 S.E.2d 676, 677 (1991) (quoting Estes v. Commonwealth, 212 Va. 23, 24, 181 S.E.2d 622, 623-24 (1971)); see also Hundley v. Commonwealth, 193 Va. 449, 451, 69 S.E.2d 336, 337 (1952) (holding that a "test of the identity of acts or offenses is whether the same evidence is required to sustain them; if not, then the fact that several charges relate to and grow out of one transaction or occurrence does not make a single act or offense where two separate acts or offenses are defined by statute").  "In applying the 'same evidence' test, 'the particular criminal transaction must be examined to determine whether the acts are the same in terms of time, situs, victim, and the nature of the

act itself.'" Johnson v. Commonwealth, 38 Va. App. 137, 146, 562 S.E.2d 341, 345 (2002) (quoting Hall, 14 Va. App. at 898, 421 S.E.2d at 459); see also Billington v. Commonwealth, 13 Va. App. 341, 345, 412 S.E.2d 461, 463 (1991) (observing that, to determine whether a defendant's conviction under a state statute is based upon the "same acts" underlying a prior federal prosecution, we must compare the acts upon which the defendant's state conviction was based with the acts underlying the violations charged in the federal proceeding).

Here, Londono was indicted federally for possessing heroin with intent to distribute and conspiring with Betancourt to possess heroin with intent to distribute. The specific acts underlying those charges were Londono's possession of the illegal drugs when the drugs were discovered in his bag at the train station in Richmond and his being in agreement with Betancourt at the time to possess the heroin, with intent to distribute. Accordingly, the federal prosecution resulted from acts that occurred in Richmond at the time the illegal drugs were discovered in Londono's possession. To sustain that prosecution, the federal government was not required to prove that Londono had transported the drugs into Virginia, only that he possessed them when they were found in his bag.

In the instant state case, Londono was indicted, tried, and convicted of transporting heroin into the Commonwealth with intent to distribute, in violation of Code § 18.2-248.01, and

conspiring to do so, in violation of Code § 18.2-248.01.[4]  The specific acts that gave rise to the state prosecution were Londono's transportation of the heroin into Virginia and his conspiracy with Betancourt to transport the heroin into Virginia. "[A] violation of Code § 18.2-248.01 occurs at the moment a person transporting illegal substances penetrates the borders of the Commonwealth."  Seke v. Commonwealth, 24 Va. App. 318, 325, 482 S.E.2d 88, 91 (1997).  Accordingly, the acts underlying the state prosecution occurred the instant Londono transported the illegal drugs across the border into Virginia and conspired to do so, both of which took place well before the train on which Londono and Betancourt were travelling reached Richmond.  To sustain Londono's conviction, the Commonwealth was not required to prove that Londono was in possession of the drugs when they were discovered in his bag at the train station in Richmond, only that he was in the act of transporting them when he crossed the border coming into the Commonwealth.

Thus, the specific acts that served as the basis of each prosecution are different in terms of when and where they occurred, as well as in terms of the nature of the acts

---

[4] Code § 18.2-248.01 provides, in pertinent part, as follows:

> [I]t is unlawful for any person to transport into the Commonwealth by any means with intent to sell or distribute . . . one ounce or more of any . . . Schedule I or II controlled substance . . . .  A violation of this section shall constitute a separate and distinct felony.

themselves.[5]  Consequently, the evidence required to sustain a
conviction in the state prosecution was not the same as the
evidence required to sustain a conviction in the federal
prosecution.  Hence, the instant prosecution is not barred by
Code § 19.2-294, and the trial court did not err in denying
Londono's motion to dismiss.

### III.  MOTION TO SUPPRESS

"In reviewing a trial court's denial of a motion to suppress,
'[t]he burden is upon [the defendant] to show that th[e] ruling,
when the evidence is considered most favorably to the
Commonwealth, constituted reversible error.'"  McGee v.
Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en
banc) (alterations in original) (quoting Fore v. Commonwealth, 220
Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).  "'Ultimate questions
of reasonable suspicion and probable cause to make a warrantless
search' involve questions of both law and fact and are reviewed de
novo on appeal."  Id. (quoting Ornelas v. United States, 517 U.S.
690, 691 (1996)).  "Similarly, the question whether a person has
been seized in violation of the Fourth Amendment is reviewed de
novo on appeal."  Reittinger v. Commonwealth, 260 Va. 232, 236,
532 S.E.2d 25, 27 (2000).  However, "we are bound by the trial
court's findings of historical fact unless 'plainly wrong' or
without evidence to support them and we give due weight to the
inferences drawn from those facts by resident judges and local law

---

[5] This view is buttressed by the fact that, unlike Code
§ 18.2-248, which mirrors the federal possession statute Londono
was charged with violating, Code § 18.2-248.01 specifically
proscribes the act of transporting illegal drugs into the
Commonwealth "by any means" and declares that "[a] violation of
this section shall constitute a separate and distinct felony."

enforcement officers."  McGee, 25 Va. App. at 198, 487 S.E.2d at 261 (citing Ornelas, 517 U.S. at 699).

Londono contends he was seized by Detectives Patterson and O'Connor when they confronted him in the cramped confines of the sleeper car.  That encounter, he argues, was not consensual because a reasonable person, so confronted, would not feel free to leave.  Thus, he asserts, the seizure violated his Fourth Amendment rights because it was not based on a reasonable, articulable suspicion that he was engaged in criminal activity. Accordingly, he concludes, the trial court erred in refusing to suppress the heroin and his statements to the police, "fruit" of the unlawful seizure.

The Commonwealth contends the encounter was consensual. Londono, the Commonwealth argues, was not seized for Fourth Amendment purposes until Detective Patterson found the suspected drugs in Londono's tote bag and had him placed under arrest by Detective O'Connor.  At that point, the Commonwealth argues, Patterson had probable cause that Londono had committed a crime. Hence, the Commonwealth concludes, the search and subsequent seizure were proper.

A passenger on a train does not enjoy the same expectation of privacy as he would at home.  See United States v. Whitehead, 849 F.2d 849, 854 (4th Cir. 1988) (noting that the Supreme Court has consistently held that "the privacy interests of individuals engaged in transit on public thoroughfares are substantially less than those that attach to fixed dwellings").  "While occupants of train roomettes may properly expect some degree of privacy, it is less than the reasonable expectations that individuals rightfully

possess in their homes or their hotel rooms."  Id.  "The diminished privacy aspects of public transportation result in part from the law enforcement exigency created by ready mobility and its potential for immediate flight from the jurisdiction, as well as from the web of governmental regulation that surrounds most forms of transportation."  Id. (citation omitted). "Passengers in sleeping cars are repeatedly subject to inquiry and oversight by conductors and other railroad personnel. Intrusions such as these necessarily reduce privacy interests from what they would be had the passengers elected to stay at home."  Id. at 855 (citation omitted).

Thus, as a passenger on the train, Londono had no reasonable expectation that no one would use the public hallway of the train to approach his room and ring the doorbell to his room. Accordingly, neither the detectives' act of approaching Londono's room nor their ringing the bell to his room implicated the Fourth Amendment.  See Shaver v. Commonwealth, 30 Va. App. 789, 796, 520 S.E2d 393, 397 (1999) (noting that one who has a "'reasonable expectation that various members of society may enter the property in their personal or business pursuits . . . should find it equally likely that the police will do so'" (quoting State v. Corbett, 516 P.2d 487, 490 (Or. Ct. App. 1973))).

We turn next to the encounter itself.  Encounters between the police and citizens "generally fall into one of three categories."  McGee, 25 Va. App. at 198, 487 S.E.2d at 261.

> First, there are consensual encounters which
> do not implicate the Fourth Amendment.
> Next, there are brief investigatory stops,
> commonly referred to as "Terry" stops, which
> must be based upon reasonable, articulable

suspicion that criminal activity is or may be afoot.  Finally, there are "highly intrusive, full-scale arrests" or searches which must be based upon probable cause to believe that a crime has been committed by the suspect.

Id. (citations omitted) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1939)).

In Dickerson v. Commonwealth, 35 Va. App. 172, 178-79, 543 S.E.2d 623, 626-27 (2001), we summarized the law governing consensual encounters, as follows:

A voluntary police-citizen encounter becomes a seizure for Fourth Amendment purposes "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Florida v. Bostick, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Id. (citation omitted). . . .  In determining whether the encounter was consensual, we must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Id. at 439.

In determining whether a reasonable person would feel he or she was not free to terminate an encounter with the police, several jurisdictions, including Virginia, have utilized a set of factors first articulated by Justice Stewart in his opinion in United States v. Mendenhall, 446 U.S. 544 (1980) (opinion of Stewart, J.). See United States v. Galvan-Muro, 141 F.3d 904, 906 (8th Cir. 1998); United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991); Parker v. Commonwealth, 255 Va. 96, 101-02, 496 S.E.2d 47, 50 (1998); Baldwin v. Commonwealth, 243 Va. 191, 196, 413 S.E.2d 645, 648 (1992). Those factors include:  "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating

> that compliance with the officer's request might be compelled." <u>Mendenhall</u>, 446 U.S. at 554 (opinion of Stewart, J.).

"An encounter between a law enforcement officer and a citizen in which the officer merely identifies himself and states that he is conducting a[n] . . . investigation, without more, is not a seizure within the meaning of the Fourth Amendment but is, instead, a consensual encounter." <u>McGee</u>, 25 Va. App. at 199, 487 S.E.2d at 262. Moreover, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . and request consent to search[,] as long as the police do not convey a message that compliance with their requests is required." <u>Bostick</u>, 501 U.S. at 434-35 (citations omitted). Fourth Amendment scrutiny is triggered only if the encounter "loses its consensual nature." <u>Piggot v. Commonwealth</u>, 34 Va. App. 45, 49, 537 S.E.2d 618, 619 (2000).

Londono maintains the encounter in this case was different because it took place on a train in the cramped confines of a sleeper car. Because he was "isolated in a sleeper car and the officers were blocking the only exit," he could not, he argues, "simply turn and walk away." A reasonable person, he asserts, would not feel free to leave under such circumstances. Accordingly, he concludes, the encounter was not consensual.

In making this argument, however, Londono focuses on the wrong inquiry. In <u>Bostick</u>, a case involving a police-citizen encounter on a bus, the United States Supreme Court held that the relevant inquiry in a case like this is not whether a reasonable person would feel "free to leave" but whether "a reasonable

person would feel free to decline the officers' requests or otherwise terminate the encounter."  501 U.S. at 435-36.  As the Court reasoned:

> When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking.  But when the person is . . . on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter.

Id.

In this case, taking into account all the circumstances surrounding the encounter between Londono and Detectives Patterson and O'Connor, we conclude that, prior to Londono's arrest, the detectives did nothing that would lead a reasonable person to feel that he or she was not free to decline the detectives' requests and terminate the encounter.  Both detectives involved in the encounter were in plain clothes, and neither had his weapon displayed.  After ringing the doorbell to Londono's room, Detective O'Connor stepped back into the doorway of the room across the hall and was merely an observer until called on to place Londono under arrest.  When Londono opened the door, Detective Patterson displayed his badge, identified himself as a police officer, and stated the purpose of the investigation. He made no accusations.

During the encounter, neither detective's manner was intimidating or threatening.  The exchange between Detective Patterson and Londono was conversational and brief.  Patterson did not raise his voice or use harsh language.  There was no

persistent questioning by the detectives or lengthy interaction between the detectives and Londono.  Prior to the arrest, neither detective physically touched Londono or prevented him from terminating the encounter by simply retreating into the room and shutting the door.  Additionally, when Londono left the room to allow Patterson to search it, the sleeper car's exits were not blocked.

In other words,

> [t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice.  It is beyond question that had this encounter occurred on the street, it would be constitutional.  The fact that an encounter takes place [in the close quarters of a vehicle used for public transportation] does not on its own transform standard police questioning of citizens into an illegal seizure.

United States v. Drayton, 536 U.S. 194, 204 (2002).

During the encounter, Londono willingly agreed to talk with Detective Patterson and answer his inquiries.  When asked by Patterson if he could search his room, Londono, without hesitation, gave his consent, saying, "Yes, go ahead," and motioned Patterson into the room.  At no time did he revoke that consent.  In the course of searching the room, Patterson discovered what he reasonably suspected were illegal drugs in Londono's tote bag, which gave rise to probable cause to arrest Londono.  See Buck v. Commonwealth, 20 Va. App. 298, 304, 456 S.E.2d 534, 536-37 (1995) ("If an officer has reason to believe that a person is committing a felony in his presence by

possessing contraband or a controlled substance, the officer has probable cause to arrest the individual without a warrant.").

Accordingly, because the detectives merely asked questions of Londono and requested consent to search his room and did not utilize force or make a show of authority that conveyed the message that compliance with their requests was required, the encounter between Londono and the detectives was consensual until the search of the sleeper-car room revealed incriminating evidence.  Consequently, Londono was not seized for purposes of the Fourth Amendment prior to the arrest.

Londono, however, also contends that, in view of his limited ability to understand and speak English, his consent to the search of the sleeper-car room was invalid.  He argues that he "lack[ed] the necessary language skills . . . to give voluntary consent to the search."  He "did not," he asserts, "understand what the officers were asking at the time of the alleged consent to search."

"[S]earches made by the police pursuant to a valid consent do not implicate the Fourth Amendment."  McNair v. Commonwealth, 31 Va. App. 76, 82, 521 S.E.2d 303, 306 (1999) (en banc). "Consent to a search must be freely and voluntarily given." Davis v. Commonwealth, 37 Va. App. 421, 433, 559 S.E.2d 374, 379 (2002) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  "When the Commonwealth bases its authority to conduct a warrantless search upon a claim that the defendant consented, the Commonwealth has the burden at trial to prove by a preponderance of the evidence that the consent was voluntary."  Camden v. Commonwealth, 17 Va. App. 725, 727, 441 S.E.2d 38, 39 (1994).

Whether a consent to search was voluntarily given "is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. In making that determination, "it is appropriate to consider the characteristics of the accused." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

After hearing evidence regarding Londono's consent to search and its attendant circumstances, the trial court ruled that the consent was voluntary. In reaching that determination, the trial judge stated:

> [A]s I've listened to the evidence, I find that [Londono] was aware of what was going on, he, he answered the questions that . . . Detective Patterson asked him. He carried on a conversation later on. I, I don't find that there's any reason he didn't give a valid consent. I think the consent was a good consent, and I think the Commonwealth has carried the burden by a preponderance of the evidence.

Based on our review of the totality of the surrounding circumstances, we cannot say that the factual finding of the trial court that Londono's consent to search was voluntarily given is plainly wrong or without evidence to support it. Indeed, the record is replete with evidence showing that Londono's ability to speak and understand English was not so limited that his consent to search was rendered invalid.

Detective Patterson testified that, throughout the encounter with Londono, he and Londono spoke entirely in English and that at no time did Londono indicate that he did not understand what the detective was saying and doing. Patterson further testified that he "[d]id not have any concerns about [Londono's] ability to

understand [him]."  Detective O'Connor, who observed Patterson's interaction with Londono during the encounter and who conversed extensively with Londono after the arrest, testified that Londono engaged in "back and forth" discussion and spoke in "complete sentences in English."  O'Connor further testified that, based on Londono's ability to converse in English and his appropriate responses to the questions put to him in English, the detective had no doubt that Londono "spoke English" and that he "understood what was going on" and "what [the detectives] were asking" during the encounter.  Additionally, Agent Bonifant, who also spoke with Londono following his arrest, testified that Londono had no difficulty communicating with him in English and that Londono gave no indication that he had any trouble understanding him.

Of further significance, Reverend Brooks, who counseled Londono following his arrest, testified that the counseling sessions were conducted in English and that Londono spoke with him in complete sentences in English.  Reverend Brooks further testified that Londono never indicated he did not understand him. Indeed, when asked by Reverend Brooks if he understood what the reverend was saying, Londono specifically told him that he did.

This evidence amply supports the trial court's factual determination that Londono's alleged limited ability to understand and speak English did not render him incapable of voluntarily consenting or withholding consent to the search of the sleeper-car room.  Accordingly, we affirm the trial court's ruling that the search of the sleeper-car room was a valid consensual search under the Fourth Amendment.

For these reasons, we conclude the trial court did not err in denying Londono's motion to suppress.

IV.   MOTION TO EXCLUDE PREVIOUSLY SUPPRESSED EVIDENCE

Londono contends the trial court erred in denying his motion to exclude evidence that had been previously suppressed in federal district court.  He argues exclusively that, because the issue of the suppression of the heroin found in his sleeper-car room and his post-arrest statements to the police had already been fully litigated by the federal court, the related doctrines of <u>res judicata</u> and collateral estoppel precluded the Commonwealth from relitigating the same issue in state court.[6]

Under the dual sovereignty doctrine, the doctrines of <u>res judicata</u> and collateral estoppel generally do not apply when, as here, "different sovereigns and, thus, different parties are involved in criminal litigation."  <u>United States v. Kummer</u>, 15 F.3d 1455, 1461 (8th Cir. 1994); <u>see also</u> <u>United States v. Peterson</u>, 100 F.3d 7, 12 (2d. Cir. 1996) (noting that estoppel principles "generally may not be invoked against one sovereign on the basis of a ruling in a prosecution brought by a different sovereign").  "The dual sovereignty concept may yield, however, if one sovereign effectively controlled the other, for example if 'the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.'"  <u>Peterson</u>, 100 F.3d at 12 (quoting <u>Bartkus v.</u>

---

[6] Although the doctrines of <u>res judicata</u> and collateral estoppel represent two distinct defenses, the question of which of the two doctrines is the applicable defense in this case is not before us on appeal, as neither party raised that question at trial or on appeal.

<u>Illinois</u>, 359 U.S. 121, 124 (1959)); <u>see also</u> <u>United States v.</u> <u>Sutherland</u>, 929 F.2d 765, 771 (1st Cir. 1991) (stating that the ruling in a prosecution by one sovereign will bind the prosecutors in a subsequent prosecution by another sovereign only if the latter sovereign "substantially controlled" the earlier action or was "virtually represented" by the prosecutors in that prior action); <u>United States v. Safari</u>, 849 F.2d 891, 893 (4th Cir. 1988) (observing that estoppel principles apply against a sovereign in a subsequent prosecution only if that sovereign was a party to the earlier prosecution in some manner).  A prosecution may be considered a "sham" only if "one sovereign so thoroughly dominate[d] or manipulate[d] the prosecutorial machinery of another that the latter retain[ed] little or no volition in its own proceedings."  <u>United States v. Guzman</u>, 85 F.3d 823, 827 (1st Cir. 1996).

The record in this case is devoid of evidence showing that the Commonwealth exercised any control over the federal prosecution or that it was represented in or a party to that prosecution in any manner.  Likewise, there is no evidence in the record showing that federal authorities manipulated the Commonwealth into prosecuting Londono for violation of state statutes or otherwise exercised any control over the state prosecution such that the Commonwealth's prosecution was a "sham and a cover for a federal prosecution."  Indeed, there is absolutely no evidence that state prosecutors were involved in the prosecution of the federal action or that federal prosecutors were involved in the prosecution of the state action.  The record makes clear that, although there were cooperative efforts between

the state and federal members of the task force and between the governments' witnesses and the prosecutors, the prosecution of the federal claims was handled entirely by the United States Attorney's Office and the state charges were prosecuted strictly by the Commonwealth's Attorney's Office. The record further shows that, following the unsuccessful federal prosecution, the Commonwealth's prosecutors undertook an independent analysis and, acting without influence of the federal prosecutors, concluded that the state interests left unvindicated by the federal proceeding were worth pursuing in state court.

The composition of the RMIU task force and the investigatory cooperation between the local law enforcement agencies and the DEA are not dispositive of this issue. See Guzman, 85 F.3d at 828 ("Cooperative law enforcement efforts between independent sovereigns are commendable, and, without more, such efforts will not furnish a legally adequate basis for invoking the [sham prosecution] exception to the dual sovereign rule."); United States v. Davis, 906 F.2d 829, 834 (2d Cir. 1990) (stating that, in determining whether one sovereign controlled another sovereign's prosecution, "the focus of [the] inquiry must be on those with the authority to act in their sovereign's name, the prosecutors, and not the law enforcement officers assigned to the [t]ask [f]orce"); Peterson, 100 F.3d at 12 (observing that the mere participation by a sovereign's law enforcement officers in an investigation that leads to a prosecution by another sovereign does not render the former sovereign a party to the latter sovereign's prosecution); United States v. Claiborne, 92 F. Supp. 2d 503, 508 (E.D. Va. 2000) (noting that, "under existing law,

there is no exception to the dual sovereignty doctrine based upon the cooperation of federal and state investigations and prosecutions").  Likewise, the fact that the members of the task force had the discretion to elect to initiate prosecution in either federal or state court does not alter the fact that the ultimate authority to file charges and control the prosecution in federal court belonged exclusively to the federal prosecutors and the ultimate authority to file charges and control the prosecution in state court belonged solely to the Commonwealth's prosecutors.

We conclude, therefore, that, because the Commonwealth exercised no control over the federal prosecution, was not represented in or a party to that prosecution, and acted of its own volition as an independent sovereign in prosecuting Londono for violation of Virginia statutes, the doctrines of res judicata and collateral estoppel are not applicable in this case. Accordingly, the trial court was not bound by the earlier decision of the United States District Court and did not err in denying Londono's motion to exclude the previously suppressed evidence.

For these reasons, we affirm the judgment of the trial court and, accordingly, affirm Londono's convictions.

<u>Affirmed.</u>