THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEREK L. HOLLAND, Defendant-Appellee.

Second District    No. 2—03—0800

Opinion filed April 4, 2005.

John A. Barsanti, State's Attorney, of St. Charles (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Linda A. Johnson, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE KAPALA delivered the opinion of the court:
Defendant, Derek Holland, was indicted for unlawful possession of

a controlled substance with the intent to deliver (720 ILCS 570/401(c)(2) (West 2002)) and unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)). Defendant moved to quash his arrest and suppress the evidence seized (725 ILCS 5/114—12 (West 2002)), and the trial court granted the motion, finding that the officer lacked reasonable and articulable suspicion that defendant was involved in a crime. The State timely appealed and filed a certificate of impairment (see 188 Ill. 2d R. 604(a)(1)). We reverse the trial court's judgment and remand the cause for further proceedings.

Officer David Brian, an Aurora police officer for eight years, was the only witness to testify at the suppression hearing. The pertinent part of that testimony revealed the following. On March 1, 2003, at approximately 11:50 p.m., Officer Brian was dispatched to an apartment building to investigate an attempted suicide. Although the dispatcher disclosed the name of the person attempting suicide and a description of that person, Officer Brian did not hear those details that night because he was attending to another police matter when he heard the dispatch. Officer Brian learned from the dispatcher that the incident was occurring on the third floor of the apartment building, but he was unsure whether the person attempting suicide would still be at that location when the police arrived. When asked about his experience with suicide attempts, Officer Brian stated that he had investigated such matters and that guns were used in at least five or six prior incidents.

Officer Brian and three or four other armed police officers in uniform arrived at the apartment building, which Officer Brian described as desolate. While in the stairwell heading to the third floor of the building, the officers saw defendant walking down the stairs. Officer Brian recognized defendant when he first saw him, realizing that he had had many contacts with defendant in the past, but he did not know defendant's name. Officer Brian also testified that he did not have an arrest or search warrant for defendant, and he did not see defendant commit any crime. Officer Brian stated that he did not know whether any crimes were committed in the area that night, but he knew that many gangs used the building's rear parking lot as a meeting place to plan crimes they would commit in a neighboring building.

As soon as defendant saw Officer Brian and the other officers, defendant put his left hand behind his back. Officer Brian asked defendant from where he was coming and to where he was going. Officer Brian posed these questions because he wanted to know whether defendant was the person attempting to commit suicide, was hurt by that person, or knew anything about the attempted suicide. Officer

Brian asked defendant to stop and show the officers his hands[1] because Officer Brian was fearful of "who knows what [defendant] might have had." Defendant refused to show the officers his hands, turned away from the officers, as if attempting to go back up the stairs, and bent over at the waist. Then, while leaning against the stair railing, defendant put his hands in front of his waistband. Officer Brian testified that "[defendant's] hands came around in front of him really fast." Officer Brian elaborated on his observations, believing that defendant's response to the police was "a little bit strange" and not the "normal action of people when they see the police who just asked them to see their hands."

At that time, another officer at the scene grabbed defendant in a bear hug, and Officer Brian pointed his service revolver at defendant, ordering defendant to drop his gun. Although Officer Brian did not see a weapon on defendant, he testified that there was no doubt in his mind that defendant was armed. Officer Brian explained that in his eight years as an Aurora police officer, he remembered 10 incidents where people concealed weapons in the waistbands of their pants.

Defendant continued to resist the officers, a struggle ensued, defendant was arrested for obstructing a police officer, and he was handcuffed. After defendant was handcuffed, a plastic bag containing 11 baggies of cocaine fell out of defendant's waistband.

On cross-examination, Officer Brian testified that he "immediately recognized [defendant] to be Derek Holland," he knew that defendant had "somewhat of a background," and, based on these past experiences, he thought defendant might be armed. Officer Brian explained that he previously was involved in a case where defendant was carrying a gun. Although Officer Brian was familiar with defendant, he admitted that he was not suspicious of defendant when he first saw him. Officer Brian also testified on cross-examination that when the officers first encountered defendant, defendant put his hand behind his back before the officers said anything to him.

The trial court granted defendant's motion to quash his arrest and suppress the evidence seized. In reaching this conclusion, the trial court stressed that officer safety is always an important concern for both officers and the people they encounter. The trial court acknowledged that looks, gestures, and furtive movements do not justify a search absent other factors and that, pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the officers could stop

---

[1]It is unclear from Officer Brian's testimony whether both of defendant's hands were behind his back at this point or just his left hand. This uncertainty does not, however, affect our analysis.

and ask defendant whether he knew anything about the attempted suicide. However, the officers could not detain defendant absent reasonable, articulable suspicion of criminal activity.

The trial court then found that defendant was seized when one of the officers grabbed him in a bear hug. The trial court noted that there were four or five officers at the scene, they were all in close proximity to defendant, and they used raised voices when ordering defendant to show them his hands. Citing *People v. Smith*, 331 Ill. App. 3d 1049 (2002), the trial court believed that the officers could not rely on the fact that defendant refused to comply with their orders as a basis to seize defendant and conduct a search. Concluding that, when the seizure occurred, the officers possessed no other facts amounting to reasonable, articulable suspicion of criminal activity, the trial court granted defendant's motion to quash his arrest and suppress the evidence seized.

On appeal, the State claims that the officers had reasonable and articulable suspicion that defendant was carrying a concealed weapon in violation of section 24—1.6(a) of the Criminal Code of 1961 (720 ILCS 5/24—1.6(a) (West 2002)). In addressing the propriety of the stop, we first consider our standard of review. The parties disagree about the proper standard to apply. The State contends that our review is *de novo* because Officer Brian was the only witness to testify and no questions were raised concerning the officer's credibility. Defendant claims that we should review the officer's testimony under a manifest weight standard and review *de novo* the trial court's ultimate legal conclusion. In making this argument, defendant notes that Officer Brian contradicted himself about when he knew defendant's name and whether he asked defendant any questions before defendant put his hands behind his back.

■ When reviewing a ruling on a motion to quash an arrest and suppress the evidence seized, our standard of review is usually twofold. We accord great deference to the trial court's factual findings and credibility determinations and reverse those conclusions only if they are against the manifest weight of the evidence. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003); *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *People v. Rockey*, 322 Ill. App. 3d 832, 836 (2001). After reviewing the trial court's factual findings, we review *de novo* the trial court's ultimate legal ruling on reasonable suspicion. *Sorenson*, 196 Ill. 2d at 431.

■ Here, the crucial facts are undisputed. Even if Officer Brian did contradict himself as to when he remembered defendant's name and when he asked defendant questions, these minor inconsistencies are

simply immaterial for purposes of our review. See *People v. Allen*, 202 Ill. App. 3d 487, 491 (1990) (determining, in probable cause case, that slight inconsistencies in the officer's testimony were inconsequential in light of the facts presented).

■ We now consider the validity of the stop. Determining whether a stop was an unreasonable seizure involves a two-step process. *People v. Croft*, 346 Ill. App. 3d 669, 675 (2004). Generally, we decide whether the stop was justified at its inception, and if it was, we then determine whether the scope of the stop was proportional to the circumstances that justified the stop in the first place. *Croft*, 346 Ill. App. 3d at 675. Here, however, no issue exists as to whether the police exceeded the scope of an initially valid stop. Thus, the only issue we consider is whether the stop was justified at its inception.

A court objectively considers whether a stop was justified. *Croft*, 346 Ill. App. 3d at 675. We look at the facts available to the officer and ask whether the officer's action was appropriate. *Croft*, 346 Ill. App. 3d at 675. An investigatory stop is proper if the officer can point to specific, articulable facts that, when combined with the rational inferences derived from those facts, provide reasonable suspicion that the person seized has committed or is about to commit a crime. *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 848 (2003). The facts supporting reasonable suspicion do not need to constitute probable cause (*People v. Brown*, 343 Ill. App. 3d 617, 622 (2003)) and can arise even when no violation of the law was witnessed (*People v. Scott*, 249 Ill. App. 3d 597, 601 (1993)). It is important to note that defendant does not assert that he was seized at any point before an officer grabbed his arms. Thus, we must determine whether reasonable suspicion existed at that point.

When we consider the situation facing Officer Brian, we conclude that the officer had a proper basis to stop defendant. First, we address the circumstances surrounding the stop. Specifically, the stop occurred in an area of gang activity and in a building where an individual was attempting suicide. Although the fact that gangs were known to plan and commit crimes in the area cannot, alone, provide reasonable suspicion to stop defendant, it is a factor that may be considered along with others to determine whether the officer had reasonable suspicion based on the totality of the circumstances. See *People v. Lockett*, 311 Ill. App. 3d 661, 669 (2000) (noting that gang activity in the area one week prior to the defendant's detention, coupled with, among other things, the officer's belief that the defendant was hiding a weapon in his hand, gave the officer a reasonable and articulable suspicion that the defendant was about to commit a crime). Moreover, the officers were responding to a suicide attempt, and, based on Officer Brian's

experience, he knew that it was not uncommon for guns to be used in such situations. When the officers arrived at the scene, they saw no one. They proceeded to the stairwell, and the first person they encountered was defendant.

Second, we must consider Officer Brian's past experience with defendant. When Officer Brian saw defendant, he knew that he had had previous contact with him, and, on at least one prior occasion, defendant was carrying a gun. Although Officer Brian testified that he was not *immediately* suspicious of defendant based on his prior encounters with him, Officer Brian's suspicions were aroused as the encounter continued and defendant continued to act strangely. Thus, the officer's familiarity with defendant must also be considered when evaluating whether the stop was justified. See *People v. Freeman*, 219 Ill. App. 3d 240, 243-44 (1991) (noting that the defendant's reputation for carrying a weapon, coupled with other evidence, led the officer to reasonably believe that the defendant may have been carrying a weapon when he was stopped on a subsequent date).

Third, after seeing the officers and reaching behind his back attempting to conceal something, defendant acted evasively. When Officer Brian saw defendant, he did not know whether defendant was the person attempting suicide. Thus, he asked defendant from where he was coming and to where he was going. At that point, the officers had not encountered anyone else in the building, and they were attempting to gather more information about the suicide attempt, which they were justified in doing. See *Florida v. Royer*, 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983) (noting that "law enforcement officers do not violate the [f]ourth [a]mendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen"). Defendant does not contend that this questioning amounted to a seizure. Just before Officer Brian was posing these questions to defendant, defendant put his hand behind his back in such a way that Officer Brian reasonably suspected that defendant was concealing something. After the officers asked to see defendant's hands, defendant quickly reached to the front of his waistband, stepped towards the railing, and turned as if trying to proceed up the stairs. Although evasive conduct is not a controlling factor, it too is a relevant factor to consider when evaluating whether the officers possessed reasonable, articulable suspicion of criminal activity. See *In re M.N.*, 268 Ill. App. 3d 893, 895-96 (1994) (noting, in protective frisk case, that unusual and evasive behavior is relevant in deciding whether officer reasonably believes that criminal activity is afoot).

Fourth, defendant's actions suggested that he might have been carrying a gun. Officer Brian testified that, after observing defendant's strange and evasive conduct, there was no doubt in his mind that defendant was carrying a gun. Officer Brian testified that he had previous experience with people concealing guns in their waistbands, that guns were frequently used in suicide attempts, and that defendant had possessed a gun on a prior occasion. Given Officer Brian's law enforcement experience, his observations, and the reasonable inferences he drew from those observations, we hold that Officer Brian had reasonable, articulable suspicion that defendant was concealing a weapon. See *People v. Moore*, 341 Ill. App. 3d 804, 810-11 (2003) (noting that reasonable suspicion must be viewed in light of officer's experience and the inferences the officer draws based on his experience).

In reaching this conclusion, we must point out how this case differs from *Smith*, on which the trial court relied. In *Smith*, the defendant was standing with his hands in his pockets in front of a " 'known drug house.' " *Smith*, 331 Ill. App. 3d at 1051. The officers, who were patrolling the area, got out of their squad car and approached the defendant, asking him what he had in his pockets. The defendant did not respond. One of the officers asked the defendant to take his hands out of his pockets, and the defendant became nervous, looked around, and began to back away from the officers. The officers told the defendant to stop and take his hands out of his pockets, and the defendant, not complying, continued to back away. The officers then grabbed the defendant's arms, forced him to the ground, and found cocaine in his pocket. The officer testifying at the suppression hearing admitted that "he had no idea what the defendant might have had in his pockets." *Smith*, 331 Ill. App. 3d at 1051. The defendant moved to suppress the cocaine, and the trial court denied the motion.

On appeal, the court first determined that the initial encounter between the officers and the defendant was proper because police may approach citizens on the street and ask them questions. *Smith*, 331 Ill. App. 3d at 1052-53. However, what initially was a consensual police-citizen encounter soon escalated into a seizure when the police grabbed the defendant's arms. *Smith*, 331 Ill. App. 3d at 1053-54. The court determined that such police action was unjustified because the facts available to the officers prior to the seizure did not create reasonable suspicion of criminal activity. *Smith*, 331 Ill. App. 3d at 1054-56. Specifically, all that the officers knew was that the defendant was standing in front of a "known drug house," he put something in his pocket, he kept his hands in his pockets, and he appeared nervous after he was asked to remove his hands from his pockets. *Smith*, 331 Ill. App. 3d at 1055-56.

Although, at first blush, *Smith* appears factually similar to this case, a closer examination reveals why *Smith* is unpersuasive. First, in *Smith*, the officers observed the defendant "not doing anything other than simply '[s]tanding there with his hands in his pockets' " (*Smith*, 331 Ill. App. 3d at 1051)) before they decided to approach him. Here, defendant attempted to conceal something when he encountered the officers who were investigating a possible suicide, which Officer Brian knew from past experience often involves a gun. Moreover, in *Smith*, the court found it significant that the defendant became nervous only after he was told to remove his hands from his pockets. *Smith*, 331 Ill. App. 3d at 1055-56. In this case, defendant exhibited nervous and strange behavior as soon as he saw the police officers, when he immediately put his left hand behind his back. Officer Brian described how defendant's unusual behavior then continued throughout the encounter. Lastly, in *Smith*, the officer had no idea what the defendant had in his pocket. Here, Officer Brian testified that previous suicide attempts he had investigated involved guns, that he was involved in a previous case where defendant had a gun, and that, in his experience, people carry guns in their waistbands. Knowing these facts, when defendant quickly moved his hands to the front of his waistband, Officer Brian reasonably suspected that defendant had a gun. Thus, in contrast to *Smith*, Officer Brian had reasonable, articulable suspicion that defendant was carrying a gun before defendant was seized. The fact that defendant, in fact, was not carrying a weapon is inconsequential in evaluating whether the stop was justified. See *Lockett*, 311 Ill. App. 3d at 664-65, 669 (police officer, who believed that the defendant was concealing a weapon, properly seized the defendant even though, in actuality, the defendant was holding cocaine and not a weapon); *Freeman*, 219 Ill. App. 3d at 244 (noting that "[t]here is no requirement, statutory or otherwise, that the officer conducting a stop-and-frisk specify a particular offense, so long as the officer reasonably may infer that a violation of any penal statute in Illinois has been or may be committed by the person detained").

Aside from his duty to advance "the governmental interest in investigating crime," a police officer has "the more immediate interest *** in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881. Our own supreme court has said that " 'courts should not set the test of sufficient suspicion that the individual is "armed and presently danger-

ous" too high when the protection of the investigating officer is at stake.' " *People v. Kantowski*, 98 Ill. 2d 75, 81 (1983), quoting *United States v. Riggs*, 474 F.2d 699, 705 (2d Cir. 1973); see also *People v. Staples*, 1 Ill. App. 3d 922, 925 (1971) (weapons search justified because defendant " 'seemed to be reaching for his pocket' " and " 'moving his hand around his coat' "); *United States v. Michelletti*, 13 F.3d 838, 842 (5th Cir. 1994) (weapons search justified because defendant, who emerged from bar at closing time with a " 'cocky,' perhaps defiant" attitude and directly approached lone officer while carrying a can of beer in his left hand with his right hand in his pocket, aroused officer's concern that he was armed "by the potentially dangerous location of [his] right hand"); *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992) (weapons search justified because intoxicated defendant's backing up as officer approached could be reasonably seen as "gaining room to use a weapon"). Here, Officer Brian and his fellow officers were justified in insuring that no harm came to any of them. Therefore, we conclude that defendant's motion to quash his arrest and suppress the evidence seized should have been denied.

For these reasons, the judgment of the circuit court of Kane County is reversed and this cause is remanded for further proceedings.

Reversed and remanded.

O'MALLEY, P.J., and GILLERAN JOHNSON, J., concur.