COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, McClanahan and Haley
Argued at Richmond, Virginia


JERALD VINCENT JONES

                                                                    OPINION BY
v.        Record No. 1069-07-2                          JUDGE JAMES W. HALEY, JR.
                                                                  AUGUST 26, 2008
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Richard D. Taylor, Jr., Judge

              Karen L. Stallard, Supervising Appellate Defender (Office of the
              Appellate Defender, on briefs), for appellant.

              Leah A. Darron, Senior Assistant Attorney General (Robert F.
              McDonnell, Attorney General, on brief), for appellee.


       Jerald Vincent Jones ("Jones") was convicted after a plea of guilty of possession of

cocaine with the intent to distribute in violation of Code § 18.2-248.  Jones entered his plea

pursuant to an agreement allowing him to appeal the denial of his pretrial motion to suppress

evidence of cocaine that police officers found inside of a bag in Jones' vehicle.  Jones maintains

that:  1) the police seized him in violation of the Fourth Amendment because they did not have a

reasonable, articulable suspicion of criminal activity at the time of the seizure and 2) the

subsequent search of a bag he dropped in the course of the seizure was likewise constitutionally

infirm.  For the following reasons, we disagree with Jones' arguments and affirm his conviction.

                                 STATEMENT OF FACTS

       A lengthy statement of relevant facts is necessary for resolution of this Fourth

Amendment issue.

Sergeant Mauricio Tovar was a detective for three years and a supervisor for a year and one-half in the Narcotics Division of the Richmond Police Department. He and his partner, Detective Fred E. Bates, a five-year veteran of that Division, were on patrol in their vehicle at the Red Roof Inn during the night of March 3, 2006. They were in plain clothes, though each officer had a yellow emblem on his jacket identifying him as "Richmond Police."

Tovar described the Red Roof Inn as "known for the trafficking of drugs." Within the preceding two weeks, he had executed a search warrant there and recovered "several kilos of cocaine." Bates explained: "The Red Roof Inn has a known history for large narcotics transactions. It's right on the exit of 95. And that's where we've done numerous buys, take-downs, and also seizures of large narcotics at that hotel."

At 11:45 p.m., the officers noticed a white BMW backed into a parking space at the hotel. During a fifteen-minute period of observation, Jones did not leave the vehicle and no one approached it. But, as Bates testified, Jones was "looking down in [his] lap the entire time. I don't know what he's doing. I don't know if he's counting money or not . . . ." Bates was asked what else made him suspicious that Jones may be involved in a narcotics transaction: "I have been doing it for 5 years. Narcotics deals never go down on time. If you set up a narcotics deal using an informant or undercover officer to meet someone, or someone to meet a dealer or a buyer, it never goes down on time. Someone is always late."

After the period of observation, the officers decided to walk over to the car and make inquiries. Bates approached the passenger's side and Tovar the driver's side. No lights were activated on the police vehicle, which was not blocking the BMW, nor did the officers draw their weapons.

Tovar: "I asked him like a couple of times, what are you doing . . . he's using a Jamaican accent. . . . [A]nd then . . . he starts to reach on the floorboard where I can't see. . . . I asked him

to put his hands on the steering wheel." On cross-examination, Tovar specifically testified he said to Jones: "Can you put your hands on the steering wheel." Initially, Jones complied: "Hands are up. I can see them. That's fine. Does it a second time. . . . [S]tart reaching for the floorboard . . . [with] . . . the right hand." Because Tovar was on Jones' left side, Tovar "could not tell what's on the floorboard." At that point, Bates yelled: "Get him out of the car, Tovar. Get him out of the car."

Tovar continued:

> I told him: Don't reach for the floorboard. If you reach for the floorboard, I'm going to assume you have a gun. And then prior to me opening the door, he starts reaching for the floorboard again . . . [this was] the third time he went to the floorboard. . . . [A]t that point I started backing away as fast as I could from the car. And I did draw my gun at that point. And as his hands were coming up, in his right hand, he had a black bag.

The Commonwealth's attorney asked: "What was your concern as he's reaching for the floorboard that third time?" Tovar answered: "My concern was that I was going to get shot."

Bates had approached the passenger side with his flashlight. Bates:

> I started looking in the backseat, and then I quickly noticed . . . right behind the passenger seat was a large bowie knife . . . the butt of the knife, the handle of it was resting up against the middle part of the seat . . .the middle part of the console. . . . It was right next to [Jones] . . . you can easily turn or barely even turn. You can use your right arm and grab the butt of the knife.

Bates responded affirmatively as to whether the knife was within arm's reach. " Q. What did you do once you saw the knife? A. I told Detective Sergeant Tovar that it was a knife right there, and get him out of the car." Bates continued: "[Tovar] is telling him to get out of the car, and no one is getting out of the car. . . . [Jones] was still talking to Sergeant Tovar. . . . And then with his right hand, I saw him going down underneath the seat . . . near the middle hump of the vehicle." At that point, Bates continued,

I drew my gun . . . and I started yelling:  No, no, no.  And he kept on.  He kept on going for whatever was underneath the seat, and his hands were completely out of my view. . . .  I was really scared. . . .  Sergeant Tovar . . . has his gun drawn . . . and I saw [Jones] coming back up with a black object in his hand that was long. . . . I'm yelling:  Stop it.  Drop.  Drop.  Drop.

Jones stepped out of the car holding a black object, which he then tossed on the front driver's seat.

That object was a zippered bag, which Bates recovered.  As Bates testified:  "As soon as I grabbed it, I could feel . . . something hard inside . . . I didn't know what it was."  On cross-examination, the following exchange occurred:  "Q.  Did it feel like a gun?  A.  I don't know. . . .  It felt hard and that's---  Q.  So you didn't know it was a gun?  A.  [A] gun could be anything.  It could have been a Derringer. . . .  It was a hard object."

The bag contained a black metal electronic digital scale (with cocaine residue), 45 grams of cocaine hydrochloride, 27 grams of cocaine base and a small amount of marijuana.  A photograph of the black bag taken on the car seat, and one taken with the scales, cocaine, and bills next to it for comparison as to size show that a reasonable fact finder could conclude that it could accommodate a small gun, a knife, or other weapon.[1]

## STANDARD OF REVIEW

Under our standard of review of the denial of a motion to suppress, the burden is on the appellant to demonstrate reversible error.  Emerson v. Commonwealth, 43 Va. App. 263, 272, 597 S.E.2d 242, 246 (2004).  We review the evidence, both adduced at the hearing on the motion and at trial.  Blevins v. Commonwealth, 40 Va. App. 412, 420, 579 S.E.2d 658, 662 (2003), aff'd on other grounds, 267 Va. 291, 590 S.E.2d 365 (2004).  We consider that evidence in the light most favorable to the Commonwealth, and grant to the Commonwealth all reasonable inferences that

_____

[1] A search of the BMW revealed a second large Bowie knife, $1,475 in cash, cell phones, and more marijuana.

may be fairly deducible from that evidence. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). And "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or 'without evidence to support them.'" McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc). However, despite the appellant's burden, and our deference to the Commonwealth and the trial court as to the evidence, it is our responsibility to review *de novo* questions of law and the "trial court's application of defined legal standards to the particular facts of a case." Watts v. Commonwealth, 38 Va. App. 206, 213, 562 S.E.2d 699, 703 (2002).

## ANALYSIS

"Police officers are free to engage in consensual encounters with citizens, indeed, it is difficult to envision their ability to carry out their duties if that were not the case." Malbrough v. Commonwealth, 275 Va. 163, 169, 655 S.E.2d 1, 4 (2008). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002).

Thus, in Londono v. Commonwealth, 40 Va. App. 377, 399, 579 S.E.2d 641, 651 (2003), we quoted with approval the following from McGee, 25 Va. App. 193, 487 S.E.2 259: "An encounter between a law enforcement officer and a citizen in which the officer merely identifies himself and states that he is conducting an . . . investigation, without more, is not a seizure within the meaning of the Fourth Amendment, but is, instead, a consensual encounter." Id. at 199, 487 S.E.2d at 262. See also, Barkley v. Commonwealth, 39 Va. App. 682, 691, 576 S.E.2d 234, 238 (2003).

Likewise, "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." INS v. Delgado, 466 U.S.

210, 216 (1984). The police approached the defendant with "no show of force or authority that would cause a reasonable person to believe that he or she was compelled to remain at the scene of the encounter or otherwise cooperate with the police." Andrews v. Commonwealth, 37 Va. App. 479, 490, 599 S.E.2d 401, 407 (2002). "Thus, we conclude, Andrews was not 'seized' within the meaning of the Fourth Amendment when [the police officer] first approached him and started asking him questions." Id.; see also McCain v. Commonwealth, 261 Va. 483, 490-91, 545 S.E.2d 541, 545-46 (2001); Washington v. Commonwealth, 29 Va. App. 5, 10-11, 509 S.E.2d 512, 514 (1999); Payne v. Commonwealth, 14 Va. App. 86, 88, 414 S.E.2d 869, 870 (1992).

On this authority, we, accordingly, conclude that the encounter between Jones and the Richmond police officers was initially consensual. However, there is no question but that, here, the initially consensual encounter resulted in a seizure. When did that seizure occur?

"The consensual encounter becomes a seizure '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Malbrough, 275 Va. at 169, 655 S.E.2d at 4 (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). "A person is 'seized' within the meaning of the Fourth Amendment if, under the circumstances presented, a reasonable person would believe he was not free to leave the scene of an encounter with the police." McCain, 261 Va. at 490, 545 S.E.2d at 545 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)) (other citations omitted).

But there is a *condition precedent* to a seizure: The individual must *submit* to the officer's force or authority. "[The Mendenhall] test is not applicable until the person submits to the officer's show of authority." Cochran v. Commonwealth, 258 Va. 604, 608, 521 S.E.2d 287, 289 (1999). "A seizure does not occur in the absence of . . . a defendant's submission to an officer's assertion of authority." McCain, 261 Va. at 491, 545 S.E.2d at 546. See also, Brown v.

City of Danville, 44 Va. App. 586, 604, 606 S.E.2d 523, 532 (2004); McLellan v.

Commonwealth, 37 Va. App. 144, 154, 554 S.E.2d 699, 704 (2001).

As noted, after the officers approached Jones and Tovar initiated conversation, Jones

reached down to the floorboard and Tovar asked him to put his hands on the wheel of the

vehicle. Then, on three occasions, Jones refused to comply with that command and reached for

the floorboard. Thus, he did *not* submit to Tovar's assertion of authority. And it was only

during this third occasion of reaching down, and simultaneously with Bates advising Tovar of

the existence of the bowie knife and telling Tovar to get Jones out of the car, that Tovar drew his

weapon and ordered Jones out of the car. Jones exited the car.

We conclude it was at that point, when Jones exited the car, and *not before*, that Jones

was seized. [2]

---

[2] On brief, Jones argues that he was seized at the time Sergeant Tovar first said: "Can you put your hands on the steering wheel." He relies upon Reittinger v. Commonwealth, 260 Va. 232, 532 S.E.2d 25 (2000), in support of his argument that a reasonable person would not have felt free to leave at that point.

Above and beyond the observation that Jones *did not comply* with this request, we find the reliance on Reittinger misplaced. The trial court had found that Reittinger, as a reasonable person, would *not* have felt free to leave, despite being told he was "free to leave" by the police officer. Id. at 236, 532 S.E.2d at 27. Nonetheless, the trial court admitted the challenged evidence on the grounds the officer articulated a reasonable suspicion Reittinger was armed during a continued seizure, justifying a protective frisk. Despite finding, in contrast to the trial court, that Reittinger was not seized, a panel of this Court reversed the conviction on the grounds that the protective frisk of Reittinger was not constitutionally justified. Reittinger v. Commonwealth, 28 Va. App. 80, 502 S.E.2d 151 (1998). The case continued en banc. There, this Court, though agreeing with the panel that defendant had not been seized after being told he was "free to leave," reversed the panel, finding a subsequent frisk during the ensuing consensual encounter was proper. Reittinger v. Commonwealth, 29 Va. App. 724, 514 S.E.2d 775 (1999) (en banc).

The Supreme Court of Virginia reversed on the grounds that Reittinger, as a reasonable person, would not have felt free to leave and was, accordingly, seized. That Court said: "Therefore, we conclude . . . that the trial court, though correct about the seizure, erred in refusing to suppress the product of the unlawful seizure and search . . . ." Reittinger, 260 Va. at 237, 532 S.E.2d at 28.

For example, on facts quite similar to the instant case, in <u>United States v. Johnson</u>, 212 F.3d 1313 (D.C. Cir. 2000), two police officers saw a woman leaning into the passenger window of a car in a parking lot and handing the defendant an object. The parking lot was in a high-crime area. The defendant made a shoving down motion. At that point, the officers approached the car with guns drawn. One officer "shouted 'Let me see your hands.'" <u>Id.</u> at 1315.

The court noted:

> If the seizure had taken place at that point, we doubt very much whether it would have been valid. . . .
> We need not focus on those questions, however, because we do not think the seizure took place immediately after Johnson's first "shoving down" motion, when [the police officer] drew his gun and ordered Johnson to raise his hands. Under <u>California v. Hodari D</u>, 499 U.S. 621 (1991), a seizure requires the application of physical force or submission to an assertion of authority. Before Johnson raised his hands, [the police officer] had made a show of authority but Johnson had not submitted to it. On the contrary, he continued to make "shoving down" motions, gestures that were the very opposite of complying with [the police officer's] order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun. In sum, by the time the stop actually took place, it was supported by Johnson's continued

---

In <u>Malbrough</u>, 275 Va. 163, 655 S.E.2d 1, our Supreme Court distinguished <u>Reittinger</u>:

> The most significant distinction between <u>Reittinger</u> and the present case is that in <u>Reittinger</u>, the trial judge, who alone had the opportunity to look the witnesses in the eye and weigh their credibility, expressly found that the deputy effectively seized Reittinger without probable cause because a reasonable person in the circumstances would conclude that his detention continued and that he was not free to leave. <u>Id.</u> at 236, 532 S.E.2d at 27. Here, the trial court, after analyzing all the attendant circumstances, made the opposite finding and concluded that a reasonable person would have felt free to ignore the request and leave the scene when Fortier asked Malbrough to consent to a search of his person.

<u>Id.</u> at 171, 655 S.E.2d at 5. In Jones' case, the trial court did *not* find that the police seized Jones without reasonable suspicion or probable cause. Thus, the deference to the trial court mentioned in <u>Malbrough</u> is equally appropriate here.

furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that Johnson may have been engaged in criminal activity.

Id. at 1316-17.

Having determined when the seizure of Jones occurred, the next inquiry is, did the police officers have a reasonably articulable suspicion, at the time of that seizure, that Jones may be involved in criminal activity and was armed and dangerous?

A police officer may elevate a consensual encounter with a citizen into an investigatory detention only if the officer has a "reasonable suspicion supported by articulate facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion is a "particularized and objective basis" for suspecting the person stopped of criminal activity. Ornelas v. United States, 517 U.S. 690, 696 (1996). That being said, as we noted in Harmon v. Commonwealth, 15 Va. App. 440, 445, 425 S.E.2d 77, 79 (1992):

> "[t]here is no 'litmus test' for reasonable suspicion. Each instance of police conduct must be judged for reasonableness in light of the particular circumstances." Castaneda v. Commonwealth, 7 Va. App. 574, 580, 376 S.E.2d 82, 85 (1989) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "In order to determine what cause is sufficient to authorize police to stop a person, cognizance must be taken of the 'totality of the circumstances—the whole picture.'" Leeth [v. Commonwealth], 223 Va. [335,] 340, 288 S.E.2d [475,] 478 [(1982)] (citing United States v. Cortez, 449 U.S. 411, 417 (1981)).

In determining "whether a police officer had a reasonable suspicion to justify the seizure, we must consider the 'totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training and experience of the investigating officer.'" Blevins, 40 Va. App. at 421-22, 579 S.E.2d at 663 (quoting Murphy v. Commonwealth, 9 Va. App. 139, 144, 384 S.E.2d 125, 128 (1989)). In addition, "[R]easonableness is judged from the perspective of a reasonable officer on the scene allowing

for the need of split-second decisions and without regard to the officer's intent or motivation."

Scott v. Commonwealth, 20 Va. App. 725, 727, 460 S.E.2d 610, 612 (1995) (citing Graham v.

Connor, 490 U.S. 386, 396-97 (1989)).

Applying the above standards, and in consideration of all the circumstances then present,

we conclude the officers, at the time of Jones' seizure, had a reasonable articulable suspicion that

Jones possessed a concealed weapon[3] and that a reasonable suspicion of that offense *ipso facto*

rendered him potentially armed and dangerous.  The potential concealed weapon to which we

here refer is not the bowie knife (though the same was concealed from Tovar's, but not Bates',

observation); rather, we refer to that which was the "black object," ultimately the black bag,

which Jones retrieved from "underneath" the car seat, despite being thrice told not to reach under

that seat.

In Andrews, 37 Va. App. 479, 559 S.E.2d 401, the defendant walked away when police

stopped to talk to him and his companions, did not provide his address, and had what appeared to

be a heavy object in his center jacket pocket.  After noting the original encounter was

consensual, this Court concluded:

> Based on the totality of the circumstances and in light of [the
> police officer's] observations and his training and experience as a
> police officer, we find that [the police officer] had reasonable
> cause to believe that Andrews might be carrying a concealed
> weapon and that the investigatory stop and limited pat-down

---

[3] For example, we have upheld convictions for possession of a concealed weapon where "the gun 'was placed underneath the floor mat on the lower, left hand corner, close to the door' on the 'driver's compartment' and near the edge of the mat."  Watson v. Commonwealth, 17 Va. App. 124, 125, 435 S.E.2d 428, 429 (1993).  See also, Leith v. Commonwealth, 17 Va. App. 620, 622, 440 S.E.2d 152, 153-54 (1994), where the gun, located in a locked console adjacent to the driver, was, nonetheless, readily accessible.

search for weapons were warranted to protect himself and others who might be in danger.

Id. at 492, 559 S.E.2d at 408.[4]

The consensus of other courts also supports our conclusion. Each case that follows, as in Andrews, began as a consensual encounter, which, as here, resulted in a seizure justified by the defendant's acts subsequent to that encounter. Moreover, each seizure was based upon a reasonably articulable suspicion that the defendant possessed a concealed weapon.

In State v. Holland, 826 N.E.2d 622 (Ill. App. Ct.), pet. for leave to appeal denied, 830 N.E.2d 6 (Ill. 2005), the court wrote:

> Defendant does not contend that the questioning amounted to a seizure. Just before [the police officer] was posing these questions to defendant, defendant put his hand behind his back in such a way [the police officer] reasonably suspected that defendant was concealing something. After the officers asked to see defendant's hands, defendant quickly reached to the front of his waistband, stepped towards the railing, and turned as if trying to proceed up the stairs. . . . Given [the police officer's] law enforcement experience, his observations, and the reasonable inferences he drew from those observations, we hold that [the police officer] had reasonable articulable suspicion that defendant was concealing a weapon.

Id. at 627-28.

> The danger to officer safety that justifies a protective search may arise after a consensual encounter . . . has commenced. . . . Thus, the Fourth Amendment inquiry as to whether a protective search was reasonable must focus on the circumstances confronting an officer when he made the decision to frisk. And while subsequently gathered facts cannot "cure" an otherwise

---

[4] We note Roulhac v. Commonwealth, 50 Va. App. 8, 646 S.E.2d 4 (2007). There, during a consensual encounter, the defendant placed his hands in his pockets and was immediately seized. "We also note that [the police officer] never asked appellant to remove his hands from his pockets . . . ." Id. at 19, 646 S.E.2d at 9. In reversing the trial court's refusal to grant a motion to suppress, we held: "The facts here do not give [the police officer] an objectively reasonable basis for suggesting that appellant was armed and dangerous. Indeed, [the police officer] testified it was his standard procedure to grab an individual's arm when the individual reaches into his pocket." Id. at 17, 646 S.E.2d at 8-9. Those facts may be contrasted with the instant case.

- 11 -

> unreasonable <u>Terry</u> stop, an individual's actions during a
> consensual encounter may both crystallize previously unconfirmed
> suspicions of criminal activity and give rise to legitimate concerns
> for officer safety.

<u>United States v. Davis</u>, 202 F.3d 1060, 1063 (8th Cir. 2002).

A California Court of Appeal wrote: "[the police officer's] order to Frank to remove his hand from his pockets did not transform the consensual encounter into a detention." <u>In re Frank V.</u>, 233 Cal. App. 3d 1232, 1238 (1991). "[W]e must determine whether Frank's conduct in placing his hands *back* in his pockets, after being told to take them out, constituted reasonable grounds for the patdown." <u>Id.</u> at 1240 (emphasis in original). "Frank's starting for his pockets again, after being told to take his hands out, provided an 'additional factor' justifying a patdown search for weapons." <u>Id.</u> at 1241.[5]

Most recently, <u>United States v. Black</u>, 525 F.3d 539 (4th Cir. 2008), addressed the question raised in this appeal.

That court began its opinion: "During the course of a voluntary citizen-police encounter, City of Richmond (Virginia) police seized Sean Black, in a constitutional sense, patted him down, and, after discovering an illegal firearm, arrested him." <u>Id.</u> at 361.

The police approached Black, and others, in a "high-crime" area. <u>Id.</u> When the police spoke to Black, he had his hand in his right-hand pocket, as if grasping an object. Told to remove his hand from his pocket, Black hesitated, but complied. <u>Id.</u> The officer noticed a bulge in the pocket, which he suspected might be a gun. Black told the officer his pocket contained either his money or his "ID." <u>Id.</u> at 362. Black then put his hand back in his pocket. <u>Id.</u>

> Only at this point in the encounter did [the police officer] put his
> hand on his own gun and tell Black, "[T]ake your hand out of your
> pocket. I don't want to have to shoot you." [The police officer]

---

[5] The other factors were the presence of the defendant in a "gang neighborhood," near a "gang house," during the nighttime, while wearing a "heavy jacket."

then ordered Black to move to the police car and thus had effectively seized him for Fourth Amendment purposes.

In the totality of these circumstances, we conclude [the police officer] had a reasonable suspicion that Black had a firearm concealed in his pocket, in violation of Virginia law, and therefore was justified in conducting a <u>Terry</u> stop and patting Black down.[6]

Id. at 365.

The foregoing analysis has considered whether a defendant's actions generated a reasonable articulable suspicion *during a consensual encounter* that the defendant possessed a concealed weapon and was, accordingly, armed and dangerous, thus justifying the seizure.[7]

---

[6] The <u>Black</u> court reviewed its prior jurisprudence on the subject. In <u>United States v. Burton</u>, 228 F.3d 524 (4th Cir. 2000), the court granted a motion to suppress the product of a seizure generated during a citizen-police encounter.

There is no evidence . . . that Burton made any moves as [the police officer] approached. He simply continued to stand by the telephone booth with his hand in his pocket. He did refuse to talk with policemen and to remove his hand from his pocket, but something more is required to establish that criminal activity is afoot.

Id. at 529.

In <u>United States v. Mayo</u>, 361 F.3d 802 (4th Cir. 2004), the appellate court reversed the grant of a motion to suppress by the district court, which had relied upon <u>Burton</u> in its analysis. <u>Burton</u> was distinguished because "the police officers had observed Mayo react to their presence by placing his hands in his left pocket and thereafter conduct himself in an evasive and suspicious manner, manifesting culpability to the officers." Id. at 803. "[T]he undisputed evidence . . . indicates that Mayo reacted to the presence of police in a manner that indicated to trained police officers that he might be carrying a gun in his left pocket." Id. at 808. This Court relied upon the <u>Mayo</u> analysis in <u>Walker v. Commonwealth</u>, 42 Va. App. 782, 791, 595 S.E.2d 30, 34-35 (2004).

[7] Code § 18.2-308 provides that

If any person carries about his person, hidden from common observation, (i) any pistol, revolver, or other weapon designed or intended to propel a missile of any kind by action of an explosion of any combustible material; (ii) any dirk, bowie knife, switchblade knife, ballistic knife, machete, razor, slingshot, spring stick, metal knucks, or blackjack; (iii) any flailing instrument consisting of two or more rigid parts connected in such a manner as to allow them to swing freely, which may be known as a nun

- 13 -

We note, but do not hold, that we cannot perceive any legal or logical reason for the application of a different reasonably articulable standard, permitting a search for weapons, during a consensual encounter, or one following a stop. The question in the latter is, was the stop justified, permitting the officer to be in the presence of the defendant; in the former, there is no question but that the officer was legally in the presence of the defendant. But in both instances, the police officer was legally justified in his presence with the defendant.

With the foregoing notation, we shall cite cases, where, given the justification on other grounds for a stop, the defendant's subsequent actions permitted a search, and one specifically for weapons. These cases are persuasive, we believe, in an evaluation of the reasonableness of the officers' actions in the instant case. State v. Parizek, 678 N.W.2d 154, 160 (N.D. 2004) ("Reaching into one's pockets after being told not to do so gives an officer an articulable suspicion that the subject might be armed and dangerous."); State v. Mann, 857 A.2d 329, 346 (Conn. 2004) ("a suspect's attempt to reach into his pocket or some other place where a weapon may be concealed is a fact that supports a reasonable suspicion that the subject is armed and dangerous"); United States v. Holmes, 385 F.3d 786, 789-90 (D.C. Cir. 2004) ("During the traffic stop, [the police officer] observed Holmes reaching under his seat as if to hide or retrieve a weapon. . . . Once out of the car, Holmes kept reaching for his back pocket despite continued warnings from the officers. These circumstances certainly gave [the police officer] ample reason to be . . . 'concerned that [defendant] could be . . . armed.'"); United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008) ("Once the car was stopped Soares refused repeated orders to remain

chahka, nun chuck, nunchaku, shuriken, or fighting chain; (iv) any disc, of whatever configuration, having at least two points or pointed blades which is designed to be thrown or propelled and which may be known as a throwing star or oriental dart; or (v) any weapon of like kind as those enumerated in this subsection, he shall be guilty of a Class 1 misdemeanor.

still and keep his hands in [the police officer's] view. . . .  [The police officer] . . . could reasonably have thought that Soares was reaching for a weapon."); United States v. Moorefield, 111 F.3d 10, 14 (3d Cir. 1997) ("in response to the [police officer's] instruction to Moorefield to remain in the vehicle with his hands in view, Moorefield attempted to exit the vehicle and raised and lowered his hands several times. . . .  Although [the police officer] testified he was not sure Moorefield was attempting to hide narcotics or a firearm . . . Moorefield's behavior embodied the kind of specific, articulable fact that Terry contemplates and, therefore, warranted a pat-down search for weapons."); United States v. Cornelius, 391 F.3d 965, 968 (8th Cir. 2004) ("At the time that [the police officer] seized Cornelius, i.e. at the time he grabbed Cornelius's right arm and placed him against the patrol car, [the police officer] had observed two specific actions that he believed endangered his safety:  (1) Cornelius had placed his hand in his jacket pocket; and (2) Cornelius had failed to follow [the police officer's] directive to remove his hand from his pocket.  The totality of these circumstances gave rise to a reasonable suspicion that Cornelius was armed and dangerous and thus justified [the police officer] in taking the action that he did."); State v. Kyles, 675 N.W.2d 449, 452 (Wisc. 2004) ("We conclude . . . that an individual's failure to keep his hands in the officer's sight is a significant factor in determining the reasonableness of an officer's suspicion that the individual being frisked might be armed and dangerous.").

Finally, we note the bedrock principle underlying the decision of the United States Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968).

> The *crux* of this case . . . is not the propriety of Officer
> McFadden's taking steps to investigate petitioner's suspicious
> behavior, but rather, whether there was justification for
> McFadden's invasion of Terry's personal security by searching
> him for weapons in the course of that investigation.  We are now
> concerned with more than the government interest in investigating
> crime; in addition, there is the more immediate interest of the
> police officer in taking steps to assure himself that the person with
> whom he is dealing is not armed with a weapon that could
> unexpectedly and fatally be used against him.  Certainly it would

- 15 -

be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

Id. at 23 (emphasis added).

In this case, Sergeant Tovar testified: "My concern was that I was going to get shot." That concern was based upon his reasonable articulable suspicion that Jones was reaching for a concealed weapon. "The law does not expect a police officer must gamble on turning away from a possible danger and chance taking a bullet in the back . . . ." Landsdown v. Commonwealth, 226 Va. 204, 212, 308 S.E.2d 106, 111 (1983), cert. denied, 465 U.S. 1104 (1984).

SEARCH OF THE BAG

Jones also argues that it was unreasonable for the police to open the black bag. After the police realized that the bag was not a gun, the argument continues, they should have returned the bag to Jones without opening it. We disagree.

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Michigan v. Long, 463 U.S. 1032, 1050 (1983). "Contrary to Long's view, Terry need not be read as restricting the preventative search to the person of the detained suspect." Id. at 1047. "[P]olice officers may, whenever they possess an articulable and objectively reasonable belief that a suspect is presently or potentially dangerous, conduct a protective search of the area within the suspect's immediate control." Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988). "Second, it does not matter that the search was of a closed container; a valid Long search extends to closed containers, such as the pouch, that are found within the vehicle's

- 16 -

passenger compartment." United States v. Shranklen, 315 F.3d 959, 963 (8th Cir. 2003). See

also, McDowell v. State, 947 A.2d 582 (Md. Ct. Spec. App. 2008).

> The Long dissenters assume that limitation (ii) [that the search for
> weapons must be limited to areas in which a weapon may be
> placed or hidden] does not prohibit search of containers in the car,
> and that would seem to be correct. But whether it always allows
> search of a container large enough to contain a weapon is unclear.
> For one thing, the Court in Long had no occasion to consider
> whether, if the container is soft, a "pat-down" of it and discovery
> of a hard object within are prerequisites to search into the
> container, just as is true of search of the suspect's person.

4 Wayne R. LaFave, Search and Seizure § 9.6(e), at 685 (4th ed. 2004). In Shranklen, the Eighth

Circuit Court of Appeals decided that the police were not required to pat down a soft container

and detect a hard object before opening the container. Shranklen, 315 F.3d at 963. We need not

address that question here because the record before us proves that the bag was within Jones'

immediate control, that the bag was big enough to contain a weapon, *and* that Detective Bates

did feel a hard object inside the bag *before* he opened it. Given our earlier holding that the police

had a reasonable suspicion that Jones was armed and dangerous, it follows that Detective Bates'

subsequent search of the black bag was a reasonable search pursuant to Long. See also, Phillips

v. Commonwealth, 17 Va. App. 27, 434 S.E.2d 918 (1993).

> It would defeat the purpose of a protective pat-down search to
> require a police officer, who seizes a closed container during a
> pat-down search on the reasonable suspicion that it contained a
> weapon, to return the container unexamined simply because it is
> neither a weapon nor evidence of a crime. "Police officers need
> not risk a shot in the back by returning containers which they
> reasonably suspect contain a dangerous weapon but may lack
> probable cause to seize."

Id. at 31, 434 S.E.2d at 921 (quoting State v. Ortiz, 683 P.2d 822, 827 (Haw. 1984)).

On brief, Jones argues that our Supreme Court's decision in Murphy v. Commonwealth,

264 Va. 568, 570 S.E.2d 836 (2002), compels a different result. We disagree. In Murphy, a

police officer was inside a house executing a search warrant, frisked the defendant for weapons,

and felt a bulge in the defendant's left pocket.  Id. at 571, 570 S.E.2d at 838.  The officer "felt a bulge of plastic" and removed a plastic bag from the defendant's pocket because he knew from his experience that marijuana is often packaged in similar bags.  Id.  Our Supreme Court reversed the defendant's conviction because:

> [The police officer]'s conclusion that the bag contained marijuana was not based on his tactile perception of the bag's contents.  Rather, his sense of touch revealed only that there was a plastic bag in Murphy's pocket.  Thus, Officer Harvey lacked probable cause to seize the item from Murphy's pocket because the character of the bag's contents as contraband was not immediately apparent from the frisk.

Id. at 574-75, 570 S.E.2d at 839.  "The purpose of this 'pat down' is not to uncover evidence of criminal activity, but to permit the officer to conduct his investigation without encountering a violent response."  Id. at 573-74, 570 S.E.2d at 839.  In Murphy, the search of the defendant exceeded the scope of a frisk for weapons.  The trial court, therefore, erred in not suppressing the drugs because the "plain feel" doctrine of Minnesota v. Dickerson, 508 U.S. 366 (1993), did not apply when the character of the bag's contents was not apparent from the frisk.  Murphy, 264 Va. at 574-75, 570 S.E.2d at 839.

Murphy does not control the outcome of this case because nothing in the record suggests that the trial court incorrectly applied the "plain feel" doctrine in denying Jones' motion to suppress.  Unlike the officer in Murphy, Detective Bates felt a hard object inside Jones' bag before he opened it.  Pursuant to Phillips and Long, it was reasonable for Bates to open the bag to determine whether or not it contained a weapon before returning the bag to Jones.  The trial court did not err in denying Jones' motion to suppress, and we affirm Jones' conviction.

Affirmed.