PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges Friedman, Chaney and Raphael
Argued by videoconference


YOVANI CARDENAS FLORES

                                                        OPINION BY
v.        Record No. 1645-23-4        JUDGE FRANK K. FRIEDMAN
                                                        APRIL 22, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David A. Oblon, Judge

Daniel A. Harvill (Daniel A. Harvill, PLLC, on brief), for appellant.

Katherine Quinlan Adelfio, Senior Assistant Attorney General
(Jason S. Miyares, Attorney General, on brief), for appellee.


This is a case that raises the novel issue of whether a criminal conviction must be

overturned where the prosecutor who pursued the charges lacked a valid license to practice law

at the time of the defendant's trial.  Yovani Cardenas Flores was convicted of two counts of

aggravated sexual battery against a child under the age of 13 after a bench trial in the Circuit

Court of Fairfax County.  On appeal, Flores challenges the sufficiency of the evidence.  He also

argues that the trial court erred in not setting aside his convictions, where the prosecuting

attorney's bar license was administratively suspended during his trial.  We disagree with both

contentions.  Accordingly, we affirm the trial court's judgment.

BACKGROUND[1]

This case involves sexual abuse of a child by her father. Y.S. was born in 2011, and her father, Flores, and mother split up in 2015. Flores was awarded physical custody of Y.S., with mother having visitation on the weekends. Flores resided in Herndon, Virginia with Y.S., J.Y.,[2] his three adult sisters, four nephews, and another couple. Flores shared a room with his two children; Flores had his own bed, and the children slept in a bunk bed.

Flores was indicted on three counts of aggravated sexual battery of a child under the age of 13 for conduct against Y.S. Two counts related to incidents occurring in May of 2021, when Flores allegedly touched Y.S.'s breasts. And the third count related to a genital touching that occurred around the New Year sometime between 2018 and 2020 ("the New Year's incident").

*The evidence adduced at trial.*

At the time of trial, Y.S. was ten years old. She testified that Flores often touched her chest beginning when she was around six years old and that he had also touched her chest within the past year. Y.S. reported that this touching by Flores made her feel "really, really uncomfortable," and so she would pretend she needed to go to the bathroom to get away from him and get to a "safe place."

Y.S. testified that, in May of 2021, she was doing homework in her bedroom when Flores touched her "chest" for approximately one minute. Y.S. also testified about the New Year's incident that occurred when she was approximately eight years old. She explained that Flores was drunk after a party and told her that they should sleep together in the same bed. Upon Y.S.

---

[1] "An appellate court must 'review the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court,' and must 'accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence' in making its determination." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).

[2] J.Y. is the younger brother of Y.S. We use the children's initials to protect their privacy.

- 2 -

getting into Flores' bed, he unzipped Y.S.'s jeans and put his hands inside her pants but over her underwear and "squeezed" her "private" parts.[3] Y.S. testified that Flores' squeezing "hurt" her, but she pretended to be asleep when Flores asked "[a]re you good?" Once Flores fell asleep, Y.S. told J.Y., who was also in the bed, to go to his own bed "because I don't want . . . my dad to do the same thing with [you]." Y.S. then went to the bathroom to cry, explaining that she felt "really devastated," "mad," and "really sad" after Flores touched her.

Y.S. testified that she did not initially tell her mother about Flores' inappropriate touching because she was "really too scared." Y.S. worried that her mother would tell Flores and that he would physically hurt her because of the disclosure. Ultimately, however, Y.S. did disclose the touching to her mother. The precipitating event resulting in her disclosure occurred in early May of 2021 when Flores had sex with Betsy, his girlfriend, in front of Y.S. and her younger brother. Y.S. stated that this upset her because she felt that Flores was intentionally "trying to do it in front of me." Less than a week after this incident, Y.S. discussed these unsettling events with her mother. Y.S. explained to her mother that she felt as though her life was becoming "more dangerous."

Mother eventually relayed Y.S.'s disclosures to Child Protective Services. When CPS failed to timely act, mother called the police. Mother testified at trial and revealed what Y.S. had disclosed to her.[4] Mother stated that Y.S. told her that Flores touched her breasts and "bottom." Mother explained that Y.S. told her that "my dad was touching my parts when he was drunk and he would say for me to go sleep with him." Y.S. told her mother that she would suggest to J.Y. to "let's go play" so she could "avoid her dad." Mother further testified that Y.S. "was afraid"

---

[3] In describing where she was touched by Flores, Y.S. explained that she did not "feel really comfortable saying, you know, the word of it." So she explained that it was a "private part" "for like using the restroom" that only "[g]irls" have.

[4] On appeal, Flores does not challenge the admission of any of mother's trial testimony.

that "he [Flores] will do something to her[,]" which is why "she evaded the situation by talking to her brother."

Y.S. was interviewed by Fairfax County Detective Roberts, who was part of the "child abuse squad" and was trained in forensic interviewing of children. A video recording of the interview was admitted at trial. Y.S. was then interviewed by a social services specialist with Fairfax County Child Protective Services. A seven-minute audio recording of this interview was admitted into evidence.[5]

Y.S. was also forensically interviewed at SafeSpot Children's Advocacy Center. The interviewer described Y.S. as "attentive," "engaging," and "polite." This interview—approximately one hour in length—was admitted at trial. Y.S. again recounted the New Year's incident and explained that on that occasion Flores was drunk and when Y.S. resisted joining Flores in his bed, he hit her. Y.S. ultimately got into bed with Flores, and then he touched her vaginal area under her jeans but over her underwear. Y.S. demonstrated how Flores squeezed her, and she stated that he only stopped once he fell asleep. Y.S. explained that she then went to the bathroom, where she cried; afterwards she went to her bed, hugged her stuffed animals, and continued to cry. Y.S. stated that the New Year's incident was the only time Flores touched her "down there," but that he would touch her chest "like every single week." Y.S. also discussed Flores having sex with his girlfriend in her presence. At the conclusion of the interview, Y.S. marked on an anatomical drawing where Flores touched her, indicating her chest, waist, and vaginal area.

---

[5] Y.S. explained in this interview that Flores would sometimes hit her. She also disclosed more details about the New Year's incident. Y.S. added that when Flores asked her to sleep with him, she initially refused; as a result, he hit her. Y.S. then acquiesced because she did not want to be hit again, and then shortly after the two were in bed together, Flores touched her.

Flores was interviewed by the Fairfax Police Department with the aid of a Spanish language interpreter. Flores stated that he was never alone with Y.S. He admitted to having sex with his girlfriend in front of Y.S. but contended that they were fully covered by blankets.

At the close of the Commonwealth's evidence, Flores moved to strike the evidence. Flores argued that there were contradictions in Y.S.'s trial testimony compared with the forensic interviews, and thus, the court should find her testimony incredible. Flores asked the court to find that the Commonwealth failed to carry its burden of proof. The court denied Flores' motion, and Flores then opted to present his own defense.

*Flores' Defense*

The crux of Flores' defense was that, because he lived with so many people, he never had an opportunity to be alone with Y.S. to touch her inappropriately. He also argued that to the extent he did touch her, such touching was innocent and not for any sexual gratification. Flores introduced drawings and writings done by Y.S. indicating that she loved her father. Flores called numerous family members and his girlfriend to testify on his behalf.

His family members and girlfriend all testified that Y.S. and Flores had a loving relationship. They testified that Flores was a good man and would never hurt Y.S. They intimated that Flores did not have an opportunity to inappropriately touch Y.S. For instance, Flores' nephew suggested that the New Year's incident did not occur because Y.S. wore dresses, not jeans, during the period in question. Betsy, Flores' girlfriend, suggested that a possible basis for the claims stemmed from the fact that Y.S.'s mother was upset that Flores' girlfriend was parenting the children.

After Flores presented his defense, he renewed his motion to strike. He argued that the Commonwealth presented insufficient evidence that he touched Y.S.'s genitals during the New Year's incident. Flores pointed to conflicting evidence regarding the year that the touching

occurred and what Y.S. was wearing. As to the touching of Y.S.'s chest in May of 2021, Flores argued that there was insufficient evidence because the victim did not provide specific times when the touching occurred, and even if the touching occurred, he did not have the requisite intent. The trial court denied Flores' renewed motion to strike.

*The verdict*

The trial court, sitting as factfinder, found Flores guilty of two counts of aggravated sexual battery.[6]

As to the New Year's incident, the court found sufficient evidence that Flores, while drunk, "touched and squeezed his minor daughter's vaginal area causing her pain" during the "period over New Year's 2019." The court further explained "that the only reason that the touching occurred was with an intent to sexually molest the child."

With respect to the May 2021 incident when Y.S. was doing homework, the court found sufficient evidence that Flores committed aggravated sexual battery when he "touched and squeezed [Y.S.'s] breast." The trial court further found that "the touching was intended to sexual[ly] molest the child."

The trial court made numerous additional factual findings, explaining why it rejected Flores' defense. The court disagreed with Flores' assertion that Y.S.'s testimony was inherently incredible: "the Court does not believe that the child was coached by her mother or by suggestive forensic interviews . . . ." Instead, the court found that "her testimony appears to be the antithesis of coaching[,]" where "[s]he didn't look or sound at all like she was following a script

---

[6] Flores was found not guilty of one count of aggravated sexual battery. The court noted that there was "credible evidence" that Flores "squeezed the child's breasts on many other occasions" but that the Commonwealth had not proven that those occasions fell within the time period contained in the indictment.

or trying to recount something that never happened." The court noted that Y.S.'s testimony about the inappropriate touching incidents was "persuasive."

The court also noted that it appeared that Flores' "own witnesses were coached[,]" given that "[t]hey testified as to the exact schedule of an otherwise random week seven months ago in a manner that sounded to the Court to be rehearsed, patterned, and obviously based on a common calendar that one of them created." Further, the court rejected Flores' contention that his touching of Y.S.'s breast and groin was innocent: "The Court simply did not believe that the touchings were incidental innocent touchings." The court further rejected Flores' argument that he had no opportunity to sexually abuse Y.S. "The Court does not believe that the Defense credibly eliminated all opportunities for Mr. Flores to molest his daughter, and the Court accepts [Y.S.]'s testimony that he did." Finally, the court rejected Flores' claim that Y.S. had a motive to testify falsely. The court then convicted Flores of two counts of aggravated sexual battery of a child under the age of 13.

*The motion to set aside the verdict*

After Flores was found guilty, but prior to sentencing, Flores moved to set aside his convictions on the ground that the prosecutor had lacked a valid law license during the pendency of his trial. Post-trial, it came to light that the prosecutor had failed to pay bar dues and was practicing under a suspended license. The record indicates that the prosecutor's failure to pay bar dues was related to her change in employment from a private law firm to the Commonwealth Attorney's Office in Fairfax County.[7] In his motion to set aside the verdict, Flores raised two primary arguments. First, he argued that, pursuant to Virginia's civil nullity rule, his convictions are a nullity since the prosecutor was unlicensed, and thus, he is entitled to a new trial. *See, e.g.*,

---

[7] There is no evidence in the record that reveals how many cases this prosecutor tried while her license was administratively suspended. The record reveals that she signed several filings during the course of the proceedings.

*Shipe v. Hunter*, 280 Va. 480, 483 (2010) (explaining that "a pleading, signed only by a person acting in a representative capacity who is not licensed to practice law in Virginia, is a nullity"). Second, Flores argued that the trial court was "placed in the awkward position of prosecuting a case for the Commonwealth *sua sponte*, which would be improper."[8]

The Commonwealth conceded that the prosecutor's license had been administratively suspended during Flores' trial but maintained that was not a basis to set aside his convictions where there were no claims of prosecutorial misconduct or prejudice suffered by Flores. Further, the Commonwealth argued that the civil nullity rule should not be applied to the criminal context.

The trial court issued a well-reasoned letter opinion denying the motion to set aside the verdict. The court noted that this was a "matter of first impression in Virginia" and held that "a prosecutor's unlicensed status will not result in setting aside an otherwise valid felony conviction unless (1) the prosecutor engaged in improper conduct, and (2) that such conduct prejudiced the defendant's substantive rights, denying the defendant a fair trial."

The trial court ultimately sentenced Flores to a total of ten years in prison with five years and four months suspended. Flores appeals.

---

[8] In the trial court, Flores did not contend that the prosecutor engaged in any misconduct or that he suffered any prejudice as a result of the prosecutor being unlicensed during the trial.

ANALYSIS

I. Flores' Convictions Remain In Force Despite the Prosecutor's Licensing Defect

Before addressing Flores' sufficiency arguments, we must analyze his claim that the criminal proceedings against him were per se invalid based on the prosecutor's suspended license. This is a question of first impression in Virginia—and it presents a question of law that we review de novo. *See, e.g.*, *Jones v. Commonwealth*, 52 Va. App. 548, 555 (2008) ("[I]t is our responsibility to review *de novo* questions of law and the 'trial court's application of defined legal standards to the particular facts of a case.'" (quoting *Watts v. Commonwealth*, 38 Va. App. 206, 213 (2002))).

A. The Convictions are not per se Invalid

The Virginia State Bar suspended the law license of the Assistant Commonwealth's Attorney who prosecuted Flores' case because she had failed to pay her bar dues through an oversight after changing jobs. It is unlawful to practice law in Virginia without being "authorized or licensed." Code § 54.1-3904; *see Nerri v. Adu-Gyamfi*, 270 Va. 28, 31 (2005) ("[T]he status of an attorney during the time his or her license is administratively suspended is no different from that of an individual or an attorney who has never been licensed in Virginia— neither is authorized to practice law in this Commonwealth."). While the prosecutor may be subject to some sort of discipline for this administrative transgression, the question before us is: how does the suspension of the prosecutor's license affect Flores' convictions?

1. The Majority of Courts Considering Criminal Convictions Obtained by Non-Licensed Prosecutors Have Upheld the Convictions

While convictions involving unlicensed prosecutors are uncommon, they are not unprecedented. And every jurisdiction to consider the question—except one—has concluded that a prosecutor's lack of license does not per se invalidate an otherwise valid conviction. For example, in *State v. Ali*, 752 N.W.2d 98 (Minn. Ct. App. 2008), the Minnesota Bar suspended a

prosecutor for failure to complete continuing legal education ("CLE") requirements. Although the *Ali* prosecutor suffered bar discipline for this indiscretion, the defendant's conviction was upheld. The court explained that: (1) the defendant failed to show any prejudice from his prosecution by an unlicensed lawyer, (2) the unlicensed prosecutor was a previously admitted lawyer on restricted status only for regulatory reasons, and (3) the integrity of the criminal justice system compels "a reluctance to set aside a criminal conviction when guilt was fairly established." *Id.* at 108-09.

The same outcome was reached in *People v. Carter*, 77 N.Y.2d 95, 101 (1990). There, a prosecutor had graduated from law school, but never bothered to obtain a license to practice law. The veteran prosecutor had been seeking convictions for sixteen years without ever being admitted to the Bar. While the appellate court blanched at the prosecutor's conduct, it ultimately concluded that his unlicensed status did not deprive the defendants he prosecuted of any constitutional rights. *Id.* at 106. Ultimately, the court found the defendant suffered no prejudice that would require dismissal of the indictments against him. *Id.* at 107.

The federal courts similarly have followed this logic. In *Munoz v. Keane*, 777 F. Supp. 282, 285 (S.D.N.Y. 1991), *aff'd sub nom*, *Linares v. Senkowski*, 964 F.2d 1295 (2d Cir. 1992), the court concluded that a prosecution "conducted by an unlicensed attorney does not violate" a defendant's due process rights. The court also confirmed that a defendant has no right to a licensed prosecutor under the Due Process Clause of the Fourteenth Amendment. *Id.* at 286; *see also Hancock v. United States*, 2014 U.S. Dist. LEXIS 203669, at *7 (M.D.N.C. Mar. 17, 2014) (prosecutor suspended from the Bar for failure to complete CLE credits did not void the convictions he procured during his suspension); *Harwell v. United States*, 2011 U.S. Dist. LEXIS 158066, at *4-5 (M.D.N.C. May 4, 2011) ("Most courts facing the dilemma have ruled that a defendant does not have a constitutional right to a properly licensed prosecutor, that the

prosecution of a case by an unlicensed or improperly licensed prosecutor does not automatically violate a defendant's rights, and/or that a defendant must show some sort of prejudice in order to challenge his conviction."); *United States v. McNeill*, 389 F. App'x. 233, 235 (4th Cir. 2010) (affirming conviction where "even if the Government's attorney was not properly licensed, there was no showing of prosecutorial misconduct and [defendant] has not shown that he was prejudiced").[9]

Illinois precedent stands in contrast to the majority rule of upholding convictions obtained by unlicensed prosecutors. In *People v. Dunson*, 737 N.E.3d 699 (Ill. Ct. App. 2000), the Illinois court vacated a defendant's conviction where the prosecutor was unlicensed during the course of the prosecution. The court opined:

> [P]articipation in the trial by a prosecuting assistant State's Attorney who was not licensed to practice law under the laws of Illinois requires that the trial be deemed null and void *ab initio* and that the resulting final judgment is also void.

*Id*. at 706. This ruling was consistent with prior Illinois precedent, *People v. Munson*, 150 N.E. 280 (Ill. 1925), in which the Illinois Supreme Court required that a prosecuting attorney be licensed and vacated a criminal conviction on the ground that the prosecuting attorney was unlicensed at the time the state obtained a criminal indictment.

---

[9] A criminal defendant enjoys the Sixth Amendment right to a competent attorney. *See, e.g.*, *Murray v. Griffith*, 243 Va. 384, 388 (1992) (explaining that "the accused is entitled to counsel who is a reasonably competent attorney and to advice that is within the range of competence demanded of attorneys in criminal cases"); *United States v. Cronic*, 466 U.S. 648, 653 (1984) (providing that "[a]n accused's right to be represented by counsel is a fundamental component of our criminal justice system"). By contrast, as the *Munoz* court recognized, a prosecutor is a criminal defendant's adversary, seeking a conviction, and the defendant "does not rely on [the] prosecutor to protect his rights." *See Munoz*, 777 F. Supp. at 286. Notably, however, "[t]he prosecutor is ultimately accountable not to any victim but to justice." *Price v. Commonwealth*, 72 Va. App. 474, 485 (2020); *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (a prosecutor serves as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done" (alterations in original) (quoting *Berger v. United States*, 294 U.S. 78, 88 (1935))).

We find the majority view more persuasive on this question; we also note that Virginia adheres to the de facto officer doctrine which militates strongly toward upholding the conviction in this setting.

### 2. The De Facto Officer Doctrine Encourages Upholding the Validity of the Convictions Here

The de facto officer doctrine stands for the basic proposition that the acts of one functioning as a government official (under legitimate claim and color of title) are treated as valid even if, due to some infirmity or technical deficiency, the governmental representative cannot properly hold her position; numerous Virginia cases embrace this principle. *See Fleming v. Anderson*, 187 Va. 788, 801 (1948); *Owen v. Reynolds*, 172 Va. 304, 309-10 (1939); *Deshazo v. Davis*, 157 Va. 517, 521 (1932); *Roche v. Jones*, 87 Va. 484, 485-86 (1891).

The most analogous Virginia case dealing with the de facto officer doctrine is *McGraw v. Williams*, 74 Va. (33 Gratt.) 510 (1880), which involved a criminal defendant's claim that his conviction must be overturned because the judge who levied it did not validly hold office at the time it was imposed. Our Supreme Court upheld the conviction, stating that all the adjudicator's judicial acts "heretofore done are valid and binding, having been done under color of authority conferred by the legislative and executive branches of the government. He was a judge *de facto*, and his judgments, decrees, and orders must (when otherwise right and proper) be recognized as valid and binding." *Id.* at 525-26.

The Court explained the parameters of the doctrine:

> The distinction between an officer *de jure*, one who is *de facto*, and a mere usurper, is well known and clearly defined. An officer *de jure* has the legal title to, and is clothed with, all the power and authority of the office. He has a title against the world to exercise the functions of the office and receive the fees and emoluments appertaining to it. He is responsible to the government and injured parties when he abuses his trust or transcends his authority. But his acts within the scope of that

authority cannot be questioned by the citizen or any department of the government.

An officer *de facto* is one who comes in by the power of an election or appointment, but in consequence of some informality, or want of qualification, or by reason of the expiration of his term of service (or it may be said also by entering upon the duties of his office before his term of service fixed by law *begins*), cannot maintain his position when called upon by the government to show by what title he holds his office. He is one who exercises the duties of an office *under claim and color of title*, being distinguished on the one hand from a mere usurper, and on the other from an officer *de jure*. A mere usurper is one who intrudes himself into an office which is vacant, and ousts the incumbent without any color of title whatever; and his acts are void in every respect.

The following definition of Lord *Ellenborough* has been adopted by text writers, as more accurate and expressive than any other, is as follows: "An officer *de facto* is one who has the reputation of being the officer he assumes to be, and is yet not a good officer in point of law."

The rule which declares that the acts of an officer *de facto* are as valid and binding as if he were an officer *de jure*, is founded on the soundest principles of public policy, and is absolutely essential to the protection of the best interests of society. Indeed the affairs of society could not be conducted on any other principle. To deny validity to the acts of such officers, would lead to confusion and insecurity, in public as well as private affairs, and thus oppose the true policy of every well regulated State.

*Id.* at 513-14.

The doctrine has been embraced repeatedly by Virginia courts for generations—and by English courts before that.[10] *Id.*; *see* Code § 1-200 ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth,

---

[10] The doctrine has also been applied in the federal courts. *See, e.g.*, *Parker v. United States*, 2006 U.S. Dist. LEXIS 64666, at *41-42 (E.D. Ark. Sep. 8, 2006) (applying de facto officer doctrine where prosecuting attorney's law license was suspended, but prosecutor was properly appointed by the Attorney General of the United States and operated under the color of authority); *Woods v. United States*, 2010 U.S. Dist. LEXIS 121845 (M.D.N.C. Nov. 16, 2010) (applying de facto officer doctrine).

shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly."). For example, in *Griffin v. Cunningham*, 61 Va. (20 Gratt.) 31, 44-45 (1870), our Supreme Court noted that "[t]his doctrine of the validity of the acts of officers *de facto* has been established from the earliest period," and it cited with approval numerous old English cases that relied upon the doctrine. Our case law reveals that Virginia strongly adheres to the de facto officer doctrine—and that all other jurisdictions but one embrace the rule that, absent prejudice to the criminal defendant, the fact that a Commonwealth's attorney is unlicensed during a prosecution does not *per se* invalidate an otherwise properly obtained conviction.

### 3. Flores Urges Us to Expand the "Civil Nullity" Rule

Against this backdrop, Flores urges us to extend Virginia's "civil nullity" rule to criminal prosecutions. His position is that the acts of unlicensed attorneys are nullities in civil cases, *see Shipe*, 280 Va. at 485; *Aguilera v. Christian*, 280 Va. 486, 489 (2010); *Nerri*, 270 Va. at 29, and that the rule should be expanded to the criminal context.[11]

We are unpersuaded. As the circuit judge cogently reasoned, there are numerous good reasons not to extend the rule to prosecutions.[12] Moreover, there is no logical reason for extending a per se rule in the absence of some misconduct by the prosecutor or prejudice to the

---

[11] We note that recent amendments to Code § 8.01-271.1(G) appear to address and soften the "nullity" rule with respect to signatures. Similarly, we note that in *Reed v. Commonwealth*, 281 Va. 471, 480-82 (2011), our Supreme Court declined to extend the civil nullity rule in a criminal context. In *Reed*, a defendant sought to vacate his criminal conviction on the basis that the grand jury foreman did not sign his indictment. The Supreme Court declined to extend the civil nullity rule—even though it could have held that an unsigned indictment, like an unsigned civil complaint, was a legal nullity. *Id.*

[12] In the trial court's words: "first, a defendant has no constitutional right to a licensed prosecutor as he does to a licensed defense attorney; second, it is common to treat civil procedure differently than criminal procedure; and, third, the dismissal of a conviction is unnecessary to police the unauthorized practice of law."

defendant. Indeed, as the circuit court observed in its letter opinion, "[e]ven in cases where a defense attorney is licensed, but proven to be deficient, courts will not automatically set aside otherwise valid convictions on *habeas corpus* grounds. Instead, the affected defendant must also prove the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984)." Consistent with this framework, where there is no prejudice claimed by the defendant, the fact that a fair trial was obtained—even if engineered by a prosecutor who is unlicensed—should not give rise to a per se invalidation of the conviction.

Moreover, under Virginia procedure many aspects of civil and criminal practice are distinct—as a review of our evidentiary rules, for example, swiftly confirms.[13] This is simply another example—much like the differing number of jurors on civil and criminal trials. *See* Va. Const. art. I §§ 8, 11. Additionally, we reject the suggestion that deterrence is a proper justification for mandating the overturning of convictions in this circumstance; certainly the Bar already can—and does—discipline lawyers who knowingly practice while their license is suspended. *See Barrett v. Va. State Bar ex rel. Second Dist. Comm.*, 277 Va. 412, 414 (2009)

---

[13] The circuit court provided the following list to illustrate this point:

> Va. Sup. Ct. R. 2:106(b) (permitting truncating of lengthy documents in civil cases but not criminal cases), 2:202(b) (mandatory judicial notice of certain material in criminal cases but not civil cases), 2:406 (permitting habit evidence only in civil cases), 2:409 (permitting evidence of repeated abuse by a victim only in a criminal case), 2:413 (permitting evidence of prior felony sexual offenses against children only in criminal cases), 2:503 (setting different criminal and civil evidentiary rules for the clergy communication privilege), 2:504 (setting different criminal and civil evidentiary rules for the spousal communications privilege), 2:505 (limiting the doctor-patient privilege to civil cases), 2:614 (permitting the Court to call witnesses in a civil case, but not a criminal case), 2:702 (setting different criminal and civil evidentiary rules for using expert witnesses), 2:703 (same), 2:704 (same), 2:705 (same), 2:706 (same), and 2:803(10) (setting different hearsay exceptions for the admission of public records and reports).

(holding "that a lawyer whose license is suspended is still an active member of the bar and, although not in good standing, is subject to the Rules"); *Rutledge v. Tenth Dist. Comm. of Va. State Bar*, 214 Va. 312, 312-13 (1973) (affirming sanction where an attorney, whose license was suspended, engaged in the practice of law during the period of suspension). And the unauthorized practice of law is a criminal violation. *See* Code § 54.1-3904 ("Any person who practices law without being authorized or licensed shall be guilty of a Class 1 misdemeanor."); *see also Nerri*, 271 Va. at 31. These disciplinary options adequately discourage the unlicensed practice of law by prosecutors. At bottom, Flores offers no persuasive policy basis or practical justification for invoking a per se rule nullifying convictions obtained by unlicensed prosecutors. We agree with the logic of the Minnesota Supreme Court that the integrity of our criminal justice system compels "a reluctance to set aside a criminal conviction when guilt was fairly established." *Ali*, 752 N.W.2d at 109.

B. Applying these Rules to the Case at Bar Confirms that Flores' Convictions are Valid

In addition to rejecting Flores' call for a per se invalidation of his convictions, we also find that, on this record, the convictions are valid under Virginia law. In applying the law to Flores' convictions, we start from the premise that the prosecutor here was not a "usurper" or "imposter." She was a previously licensed attorney who was hired through proper channels to be a member of the Commonwealth Attorney's staff.[14] There is no suggestion of active misconduct or that she was aware of the defect in her license during Flores' trial—her dues letter was apparently sent to her prior employer. She promptly alerted Flores when the defect became known. Flores does not claim that he suffered any prejudice as a result of the licensing defect. Moreover, during the trial the prosecutor was clothed in the de facto trappings of her office.

---

[14] There is no claim to the contrary.

- 16 -

We hold that in the absence of prejudice, convictions obtained by an unlicensed Commonwealth's attorney remain binding and valid even if there is an unknown defect in her license at the time she conducts a prosecution. Again, we decline Flores' invitation to invoke a per se rule that convictions obtained by unlicensed prosecutors are automatically null and void. This is not to say that an imposter's acts,[15] or an unlicensed prosecutor's prejudicial misconduct, cannot be grounds for overturning a conviction under proper facts. Indeed, the Commonwealth, on brief, recognizes that prejudice is a relevant consideration in this setting. However, since Flores concedes there was no prejudice here, his convictions must stand. Simply put, there is no factual or legal basis for invalidating Flores' convictions based solely on the prosecutor's licensing deficiency where it is conceded that the licensing issue did not prejudice Flores.[16]

II. The Trial Court did not Err in Denying Flores' Renewed Motion to Strike the Evidence, Where There was Sufficient Evidence that the Touching Occurred and Flores had the Requisite Intent

Flores assigns error to the trial court's denial of his motion to strike the evidence because "the Commonwealth failed to prove sexual abuse beyond a reasonable doubt due to the failure to prove that any touching occurred, or that it occurred with the requisite intent to 'molest, arouse, or gratify any person.'"

---

[15] A usurper or imposter intrudes himself into an office without color of title and his acts are void. *McGraw*, 74 Va. (33 Gratt.) at 513-14. Again, the logic behind the de facto officer doctrine is to promote stability and trust in governmental functions—not to reward lawlessness.

[16] We note that prejudice is not generally an element of the de facto officer analysis. However, in criminal prosecutions the defendant's liberty interest is at issue. *See Gideon v. Wainwright*, 372 U.S. 335, 343 (1963) ("[The assistance of counsel] is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty . . . ." (alterations in original) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938))). In this context, various courts have considered prejudice as a proper variable in this analysis. *See Parker*, 2006 U.S. Dist. LEXIS 64666, at *41-43 (discussing interplay between the de facto officer doctrine and the typical requirement that a defendant must show prejudice to obtain a new trial); *Harwell*, 2011 U.S. Dist. LEXIS 158066, at *5-7 (same). In this case, again, no prejudice is alleged.

"Under the governing standard, 'we review factfinding with the highest degree of appellate deference.'" *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). "When presented with a sufficiency-of-the-evidence challenge in criminal cases, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Id.* (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* at 97 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

> In such cases, this Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Rather, the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Furthermore, [t]hese principles apply with equal force to bench trials no differently than to jury trials.

*Commonwealth v. Murgia*, 297 Va. 310, 321 (2019) (alteration in original) (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).[17]

Flores was convicted of two counts of aggravated sexual battery under Code § 18.2-67.3(A)(1), which states, in relevant part, that "[a]n accused is guilty of aggravated sexual battery if he . . . sexually abuses the complaining witness," and "[t]he complaining witness is less

---

[17] Flores also contends that the trial court erred in denying his first motion to strike the evidence, where there was reasonable doubt (1) that Flores had the requisite intent and (2) whether the incidents even occurred. We conclude that this assignment of error—related to his initial motion to strike—is not preserved because he opted to present evidence in his own defense. *See Murillo-Rodriguez v. Commonwealth*, 279 Va. 64, 73 (2010) ("When a defendant in a civil or criminal case proceeds to introduce evidence in his own behalf, after the trial court has overruled his motion to strike, made at the conclusion of the introduction of plaintiff's evidence in chief, he waives his right to stand upon such motion." (quoting *Spangler v. Commonwealth*, 188 Va. 436, 438 (1948))). Flores did, however, preserve his subsequent motion to strike at the conclusion of all the evidence.

than 13 years of age[.]" "Sexual abuse" is defined as "an act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts[.]" Code § 18.2-67.10(6). "Intimate parts" is defined as "the genitalia, anus, groin, breast, or buttocks of any person, or the chest of a child under the age of 15." Code § 18.2-67.10(2).

"Intent is the purpose formed in a person's mind and may be, and frequently is, shown by the circumstances. It is a state of mind which may be proved by a person's conduct or by his statements." *Mason v. Commonwealth*, 49 Va. App. 39, 45 (2006) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "Whether the required intent exists is 'a question of fact for the trier of fact[.]'" *Cornell v. Commonwealth*, 76 Va. App. 17, 29 (2022) (quoting *Brown v. Commonwealth*, 68 Va. App. 746, 787 (2018)). "The inferences to be drawn from proved facts are within the province of the trier of fact, so long as the inferences are reasonable and justified." *Mason*, 49 Va. App. at 45 (quoting *Barrett v. Commonwealth*, 210 Va. 153, 156 (1969)).

"[A] conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). "Because sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Garland v. Commonwealth*, 8 Va. App. 189, 191 (1989). "Thus, it is clear that the victim's testimony, if credible and accepted by the finder of fact, is sufficient evidence, standing alone, to support the conviction." *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984).

With these background principles in mind, we have no trouble concluding that there was sufficient evidence to sustain both convictions against Flores for aggravated sexual battery

against a child under the age of 13.  The trial court expressly found Y.S. to be credible and persuasive.  The court, on the other hand, found Flores' witnesses to be "coached."  Further, the court rejected Flores' claim that his touching of Y.S. was innocent.

There was sufficient evidence that Flores had the requisite intent to sustain his aggravated sexual battery conviction when he touched Y.S. as she did homework.  The trial court rejected Flores' contention that he did not have the intent "to sexually molest, arouse, or gratify": "The Court finds . . . that the touching was intended to sexual[ly] molest the child."  This factual finding is supported by evidence.  Y.S. testified that Flores touched and squeezed her breast for approximately one minute in a manner that made her "really uncomfortable" because "[she] do[es]n't like people touching [her] private parts."[18]  Because corroboration is not required to sustain Flores' conviction, *Wilson*, 46 Va. App. at 87, and Flores does not contend on appeal that Y.S.'s testimony is inherently incredible, *see Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019), the trial court was not plainly wrong or without evidence in finding that Flores had the requisite intent under Code § 18.2-67.3(A)(1).

There was also sufficient evidence to sustain Flores' second conviction related to the New Year's incident.  Flores argues both that there was insufficient evidence that the touching even occurred, and if it did, he did not have the requisite intent.  On this count, the trial court found that "Flores touched and squeezed his minor daughter's vaginal area causing her pain."  Further, "Flores did it at a time when he had been drinking, and the court finds that the only reason that the touching occurred was with an intent to sexually molest the child."  The trial court's finding is not plainly wrong or without evidence, where Y.S. testified that Flores

_____

[18] The trial court noted that although "[t]he child didn't know the names of her sexual parts, . . . she repeatedly identified where on her body was squeezed and was able to draw them in forensic interviews."

"squeezed" her vaginal area after a New Year's Eve party in which Flores was drunk. Y.S.'s testimony alone was sufficient to sustain this conviction. *Fisher*, 228 Va. at 299.

On appeal, Flores points out that there was evidence Y.S. wore a dress on New Year's Eve, not jeans. Flores also claims he had no opportunity to be alone with Y.S. Neither of these arguments are persuasive. As the Commonwealth correctly asserts, the factfinder was not required to accept the testimony of Flores' witnesses, who the court noted seemed to be "coached." *See Kelley*, 69 Va. App. at 626 (explaining that the factfinder determines the credibility of the witnesses and the weight accorded their testimony and may accept or reject the testimony in whole or in part). Similarly, Flores argues Y.S.'s testimony was inconsistent. To the extent there was inconsistent testimony, that goes to the weight of the evidence. *See, e.g.*, *Fordham v. Commonwealth*, 13 Va. App. 235, 240 (1991) ("Inconsistent statements by a witness go to the weight and sufficiency of the testimony, not the competency of the witness."). And, here, the trial court expressly found Y.S.'s testimony to be credible. Finally, Flores' claim that he did not have the requisite intent for the New Year's incident is without merit, where the factfinder specifically found that the purpose of the touching was to sexually molest Y.S.

Thus, we conclude that there was sufficient evidence to sustain both aggravated sexual battery convictions against Flores. A review of this record confirms that the trial court's findings are not plainly wrong or without evidence to support them.

CONCLUSION

The trial court did not err in finding sufficient evidence to convict Flores of two counts of aggravated sexual battery—nor in denying his motion to set aside the verdict.

*Affirmed.*